ALEXANDER CROSS, WILLIAM L. HOBSON, AND WILLIAM HOOP-
ER, TRADING UNDER THE NAME AND STYLE OF CROSS, HOBSON,
& COMPANY, PLAINTIFFS IN ERROR, *v.* EDWARD H. HARRISON.

In the war with Mexico, the port of San Francisco was conquered by the arms of the
United States, in the year 1846, and shortly afterwards the United States had mili-
tary possession of all of Upper California. Early in 1847 the President of the Uni-
ted States, as constitutional commander-in-chief of the army and navy, authorized
the military and naval commanders of the United States forces in California to ex-
ercise the belligerent rights of a conqueror, and to form a civil and military govern-
ment for the conquered territory, with power to impose duties on imports and ton-
nage for the support of such government, and of the army, which had the conquest
in possession.

This was done, and tonnage and import duties were levied under a war tariff, which
had been established by the civil government for that purpose, until official notice
was received by the civil and military Governor of California, that a treaty of
peace had been made with Mexico, by which Upper California had been ceded to
the United States.

Upon receiving this intelligence the governor directed that import and tonnage duties
should thereafter be levied in conformity with such as were to be paid in the other
ports of the United States, by the acts of Congress; and for such purpose he ap-
pointed the defendant in this suit, collector of the port of San Francisco.

The plaintiffs now seek to recover from him certain tonnage duties and imposts
upon foreign merchandise paid by them to the defendant as collector between the
3d of February, 1848, (the date of the treaty of peace,) and the 13th of November,
1849, (when the collector appointed by the President, according to law, entered
upon the duties of his office,) upon the ground that they had been illegally ex-
acted.

The formation of the civil government in California, when it was done, was the law-
ful exercise of a belligerent right over a conquered territory. It was the existing
government when the territory was ceded to the United States; as a conquest, and
did not cease as a matter of course, or as a consequence of the restoration of peace;
and it was rightfully continued after peace was made with Mexico, until Congress
legislated otherwise, under its constitutional power, to dispose of and make all need-
ful rules and regulations respecting the territory or other property belonging to the
United States.

The tonnage duties, and duties upon foreign goods imported into San Francisco,
were legally demanded and lawfully collected by the civil governor, whilst the war
continued, and afterwards, from the ratification of the treaty of peace until the re-
venue system of the United States was put into practical operation in California,
under the acts of Congress, passed for that purpose.

THIS case came up, by writ of error, from the Circuit Court
of the United States, for the Southern District of New York.

Cross, Hobson, & Co., brought an action of assumpsit to reco-
ver back from Harrison, moneys paid to him while acting as col-
lector of customs at the port of San Francisco, in California, for
tonnage on vessels and duties on merchandise, not of the growth,
produce, or manufacture of the United States, imported by the
plaintiffs from foreign places into California, and there landed,
between February 3, 1848, and November 12, 1849.

The plea was *non assumpsit*, and the verdict and judgment
were for Harrison, in January, 1852.

The bill of exceptions contained the substance of much testi-

Cross et al. *v.* Harrison.

mony offered by the plaintiff, (which it is not necessary to recite,) and also the whole of the Senate Document, No. 18, of the first session of the thirty-first Congress. The opinion of the court contains a statement of the material parts of this evidence.

The case was argued by *Mr. Richard T. Merrick* and *Mr. James W. McCullok*, upon a brief filed by himself and *Mr. John S. McCullok*, for the plaintiffs in error, upon which side there was also filed a brief by *Mr. Rockwell* and *Mr. Lawrence ;* and by *Mr. Cushing*, (Attorney-General,) for the defendant in error.

The briefs on both sides were so elaborate that only a portion of each can be inserted; and those parts are selected which relate to the legality of continuing, after the peace, the government which had been established during the war.

The points for the plaintiffs in error, as stated by the *Messrs. McCullok*, were the following points:

1st. That on foreign goods or vessels brought into California, between the 3d of February, 1848, and the 3d of March, 1849, and between the 3d of March, 1849, and the 12th of November, 1849, duties did not accrue to the United States, and their exaction was therefore illegal.

2d. That on foreign goods and vessels brought into California between the 3d of February, 1848, and the 12th of November, 1849, the defendant had no authority by any treaty or law of the United States to collect duties, and their exaction was therefore illegal.

3d. Between the 3d of February, 1848, and the 12th of November, 1849, the defendant was not authorized, by any law of the United States, to require the plaintiffs to go with or send to a port within a collection district of the United States, foreign goods and vessels, and there pay duties, before the plaintiffs should bring the same into California; nor to put plaintiffs to elect between so doing and the paying of duties to the defendant.

4th. That after the 23d of February, 1849, when the plaintiffs protested against the exactions made, or to be made, the defendant was not justified in paying over the moneys theretofore or thereafter exacted to the use of the United States, or any other person.

5th. That the plaintiffs are entitled to the customary interest of California, on all sums exacted by defendant by duress, and against protest, on goods and vessels brought into California between the 3d February, 1848, and the 12th of November, 1849.

6th. That on the whole evidence, no part of the duties claimed were paid voluntarily, but each and every of them were exacted by compulsion and duress.

Under the foregoing points, the plaintiffs in error will rely upon the following authorities:

1st. Between the 3d of February, 1848, and the 12th of November, 1849, duties did not accrue to the United States in California.

(a.) The wisdom, goodness, and power necessary for the protection of the general welfare and peace of the people, are the only source from which is derived the authority to exercise the sovereignty of the nation. 1 Burlamaqui Nat. Law, c. 9, pp. 83, 89. And on these the power to reward and punish rests. Id. 93. The powers which the sovereign exercises, are those which relate to internal administration. 2 Burlamaqui, Pt. 3, c. 1, p. 152. And next, those which regulate foreign or external administrations. 2 Id. Pt. 4, c. 1, p. 220. Among this last class are the powers of making offensive or defensive war, of concluding treaties and alliances, of controlling the immigration of foreigners, and of regulating commerce. By the laws of war, the sovereign acquires the right to spoil, plunder, and destroy the goods of his enemy, and possess his lands. 2 Burlamaqui, Pt. 4, c. 7, p. 290, &c. In order to indemnify for the expenses of war out of his enemies' goods and lands, and while the conqueror continues in possession of the lands, he is sovereign over them, and of all within them; and may either admit the vanquished to the rights of subjects, or banish them as enemies from the country, for the sovereignty thus acquired is absolute. 2 Burlamaqui, Pt. 4, c. 8, § 12, p. 309. And from these rights of war flows the sovereign power of making treaties, equal or unequal, (2 Burlamaqui, Pt. 4, c. 9, pp. 314, 317, 319,) and whether in war or in peace — such treaties being unequal whenever they limit the powers of the foreign sovereign; as by stipulating that the conqueror's consent shall be had before the foreign sovereign can act in any given way. Id. § 13, p. 319.

The power to regulate foreign commerce necessarily includes, as one of its incidents, the power to lay imposts on foreign goods, or even to prohibit them entry, (Vattel's Law of Nations, Bk. 1, c. 8, p. 39,) whenever the welfare of the State demands it. The right to trade with a foreign nation is therefore conventional, and the treaty that cedes the right is the measure or limit thereof — dependent on the will of the foreign sovereign, and not a right of prescription. And a foreign nation may limit its foreign trade to itself, or to its own vessels, by treaty or otherwise. Vattel, Bk. 2, c. 2, p. 121.

During the flame of war, a nation may sell or abandon part of its public property, (Vattel, Bk. 1, c. 21, p. 105,) though, if the sovereign be not absolute, this may require the concurrence

of his coördinates, the people.   The empire or sovereignty, and the domain or property, are not inseparable — for the nation may have its sovereignty but not its domain — which may be held in the possession of a foreign nation, either by war or treaty.   Vattel, Bk. 1, c. 23, p. 118.

(b.)  The sovereign who acquires a country by conquest or treaty, has the exclusive right to legislate in regard to it, and may impart this right to another; and the country so acquired may be retained in a subject condition, or be erected into a colony.

The laws of the conquered or ceded country remain, until changed by the sovereign conqueror, who may change the political form of government; but the laws of trade remain.  Dwarr. on Stat. 907; Hall *v.* Campbell, Cowp. Rep. 204; Calvin's Case, 7 Rep. 176.   And where the power to legislate therein has been granted by charter or statute to another, there the laws of the conqueror do not extend into such territories.   Dwarris, 526, 527; 3 and 4 William 4, c. 93, relating to Governor and Council of India.

But where the country is acquired by the right of occupancy and discovery, and peopled by the subjects of the sovereign who makes the discovery, the colonists carry with them such laws of their sovereign as may be applicable to their condition. Dwarr. on Stat. 905; Attorney-General *v.* Stuart, 2 Meriv. Rep. 143.

All laws, beneficial to such colonies, go with the colonists; but penal laws, inflicting forfeitures and disabilities, never extend to colonies not *in esse*, (Dawes *v.* Painter, Freeman, 175; Dwarris, 527,) nor do laws of tithes, bankruptcy, mortmain, or police.

The laws of the sovereign, passed after the settlement of a country, whether ceded, conquered, or discovered, do not affect such colony unless specifically named; or, unless they relate to the exercise of the foreign powers of the sovereign, in regard to navigation, trade, revenue, and shipping.  Dwarr. on Statutes, 527, 906; 1st Report of Commr's West Indies, Legal Inquiry, 2, 6; Parl. in Ireland, 12th Rep. 112.

Thus we find that, after the discovery of the North American Colonies, till the Revolution, Great Britain regulated the foreign trade of these her colonies, by various acts of parliament, passed to limit it to the vessels of British subjects and to British ports, and to encourage it.   She controlled the tobacco trade by statutes — (1670, 22 and 23 Car. 2, c. 26; 1685, 1 James 2, c. 4; 1695, 7 William 3, c. 10; 1699, 10 and 11 William 3, c. 21; 1704, 3 and 4 Anne, c. 5; 1709, 8 Anne, c. 13; 1713, 12 Anne, c. 8.)   She restrained all imports and exports to and

from America to British ports and British ships — (12 Car. 2, c. 12, §§ 1, 2, 3, 4, 19; 7 and 8 Wm. 3, c. 22, § 13; 8 Anne, c. 13, § 23; The Recovery, 6 Robinson, 346; Wilson *v.* Marriatt, 8 T. R. 31; 1 Bos. & Pull. 432; 2 Evans's British Statutes, 51; 15 Car. 2, c. 7; 2 Evans's Stats. 58, 62; Grant *v.* Lloyd, 4 Taunt. 136.)   She regulated the import of prize goods into and from America, — (1711, 10 Anne, c. 22; 1742, 15 George 2, c. 31; and 1744, 17 George 2, c. 34.)   She encouraged and controlled all the trade to her colonies, by statutes — (1695, 7 William 3, c. 22; 1707, 6 Anne, c. 37; 1710, 8 Anne, c. 27; 1733, 6 George 2, c. 13; 1740, 13 George 2, c. 31.)   She forbade exports from her colonies to certain foreign countries — (1731, 4 George 2, c. 15; 1732, 5 George 2, c. 22; 1757, 30 George 2, c. 9.)   She regulated the import of coffee, tea, and other goods into these colonies; appointed commissioners of the revenue, and provided penalties for the violations of such laws — (1763, 4 George 3, c. 15; 1765, 5 George 3, c. 45; 1766, 6 George 3, c. 49 and 52; 1767, 7 George 3, c. 41, 46, 56; 1768, 8 George 3, c. 22; 1772, 12 George 3, c. 7 and 60; 1773, 13 George 3, c. 44.)   And following up her legislation in regard to these colonies, Great Britain in 1772, (12 George 3, c. 60,) allowed a drawback on tea, exported to her British North American Colonies; and, until the Revolution, entirely controlled the trade and duties laid in the colonies.  Journals of Congress, Vol. 1, pp. 27, 31, 33 to 39, 47, 394 to 396; Gales & Seaton's Debates in Congress, 216.

The oppression of these laws of Great Britain upon her colonies having resulted in the destruction at Boston, on the 31st December, 1773, of teas imported there by the East India Company, on which they had paid duties; in the meeting of the Congress of the Colonies on the 5th of September, 1774, at Philadelphia; in Great Britain's denouncing them out of her protection on the 20th of December, 1775; in the Declaration of Independence of 4th of July, 1776; in the acknowledgment of the independence of the United States by Great Britain, on 30th November, 1782; and in the Treaty of Peace, signed at Paris on the 2d of September, 1783, — the United States became independent and absolute sovereignties.

(c.) From the 2d of September, 1783, until the adoption of the Constitution by the States, respectively, each had, and several of them exercised, the power of regulating its foreign commerce, and laying imposts and tonnage duties.  Journals of Congress of the Confederation, Vol. 2, 298, 301; Gales & Seaton's History of Debates in Congress, 111.   Georgia laid 1*s.* 8*d.* sterling on tonnage; and South Carolina laid 1*s.* 3*d.* sterling, (id. 300); Pennsylvania laid a tonnage on vessels of nations in treaty;

Cross et al. v. Harrison.

Maryland laid 1s. 8d. per ton on vessels in treaty, and 2s. 8d. on others, except British, which paid 6s. 8d. and two per cent. on goods therein; Virginia laid a tonnage of 3s. 6d. on vessels in treaty, and 6s. 6d. on non-treaty vessels, and two per cent. ad valorem on goods therein; and South Carolina laid 2s. 9d. sterling on British sugars, and 1s. 8d. on those of other nations. Id. 275.

By the Confederation of 17th November, 1777, the States still reserved to themselves the right to regulate their foreign commerce, and to lay duties. See article 6th, vol. 2, Journals of Congress of the Confederation, 298, 301, 330. There were, however, secured to the citizens of different States certain rights by the Confederation in regard to imports and exports of goods from State to State. Arts. 4, 6, 2 volume Journals of Confederation, 330.

It is true that the Congress of the Confederation, on the 22d September, 1774, (see Journal of Congress, vol. 1, 14,) requested the merchants and others in the colonies to recall all orders for goods from Great Britain, and on the 27th September, 1774, (id. vol. 1, 15,) resolved, that after 1st December, 1774, there should be no importation of goods from Great Britain or Ireland, nor purchase of goods if imported thence; and that on 20th October, 1774, (id. vol. 1, 23 to 26,) the non-importation, non-consumption, and non-exportation agreement was signed by the members of Congress, yet the Congress did not, in fact, execute these resolves; and on 6th April, 1776, (id. vol. 1, 307-8,) a resolve was passed allowing importations and exportations to the citizens of the colonies, and of all nations, except to and from those under the dominion of Great Britain, subject to the duties laid or to be laid by the colonies.

Yet, before the Revolution, a commercial combination regulated the importations between America and Great Britain. If any man was suspected of an infraction of the non-importation agreement, his conduct was strictly watched, and if his guilt was discovered he was published and held up to the world as an enemy to his country. Gales & Seaton's History of Debates in Congress, vol. 1, 320, speech of Mr. White.

The means to defray the expenses of government, under the Confederation, for common defence and general welfare, were obtained by requisitions on the several States, for such sums of money as should be in proportion to the value of the lands and improvements in possession, or in grant to the citizens of the State, (Journals of Congress of Confederation, October 14th, 1777, vol. 2, 288,) to be estimated in such way as Congress should appoint. See Confederation, article 8, vol. 2, Journal of Congress, 330, November 15th, 1777. These quota were fixed.

by Congress, from time to time, according to the number of the white inhabitants in each State. Art. 9, Confederation; see vol. 2 of Journals of Confederation, 336, 337; also id. 346, November 23d, 1777, and the Report of the Committee of the Board of Treasury, id. 332.

From these authorities it will appear that the States, individually, regulated their foreign commerce and duties, and were in this respect foreign sovereigns to each other, and they maintained this relation until the adoption of the Constitution of the United States. Thus we find that by the 7th article of the Constitution, the ratification thereof by the conventions of nine of the original thirteen States was to be sufficient for the establishment of the Constitution, and that on 26th July, 1788, eleven of the thirteen had adopted it, and that North Carolina and Rhode Island stood aloof; the first until 2d November, 1789, and the last till 29th May, 1790. See Mr. Hickey's Book, published in 1847, p. 24.

Between the 26th July, 1788, and 29th May, 1790, Rhode Island was therefore in the position of a foreign State, regulating her own commerce, and laying her own duties, and she did not send deputies to the convention at Philadelphia to form a Constitution. See Gales & Seaton's History of Debates in Congress from 1789 to 1791, vol. 1, p. 4 of Introduction. Rhode Island was thus in a position to force British goods into the United States, by Long Island and Connecticut. Id. p. 124, Mr. Boudinot's speech. She did, in fact, enter into the neighboring States linen and barley that had not paid duty to the United States. Id. p. 164.

(d.) The position of North Carolina and of Rhode Island was that of foreign States, as to the United States, and they were so treated by the Congress of the United States, under the Constitution. Thus (Gales & Seaton's History of Debates in Congress from 3d March, 1787, to 3d March, 1791, vol. 1, pp. 1011, 1012,) a bill passed the Senate to prevent goods from being brought from Rhode Island into the United States; and (History of Congress from March 4, 1789, to March 31, 1793, by Carey, Lea & Blanchard, p. 609, 2d sess. 1 Cong. Senate Journal, p. 134,) on 28th April, 1790, a committee was appointed to consider what provisions would be proper for Congress to make respecting Rhode Island; and on 11th May, 1790, their report was considered, (same Journal, p. 138, 139,) and a resolution was passed, that all commercial intercourse between the United States and Rhode Island from 1st July next be prohibited; and on 13th May, 1790, the committee reported a bill for that purpose; on 14th May, it was ordered to a third reading, and on the 18th May, it was passed by the Senate, 13 ayes to 7 noes.

In the House, it passed first and second readings; and on 1st June, 1790, the President communicated, by a message to both houses, that Rhode Island had acceded to the Constitution. See House Journal, p. 219, 232; also, Gales & Seaton's History of Debates in Congress, vol. 2, p. 1009, 11th May, 1790. When Rhode Island came into the Union, acts of Congress were passed to extend to this State, the laws of Congress relative to the judiciary, the census, &c. vol. 1 Gales & Seaton's History of Debates in Congress, pp. 1020, 1023, 1026; Id. 1711; also, Id. 1006.

The State of Vermont was admitted by 1 Stat. at L. 191, c. 7, February, 1791, and laws extended over her by c. 12, March, 1791, 1 Stat. at L. 197, 198.

Rhode Island and North Carolina were, therefore, until they adopted the Constitution of the United States, foreign to the United States, and to the laws of Congress, and were outside of all provisions in regard to commerce and duties, unless expressly named in the statutes of Congress. The General Collection Act of 31st July, 1789, c. 5, (1 Stat. at Large, p. 29,) by section 1, establishes collection districts, in each of the eleven States that had adopted the Constitution; and by section 39, 1 L. U. S., 48, recites that North Carolina and Rhode Island had not adopted the Constitution, and "lays duties on goods not the produce of those States, when imported from either of them into the United States." The act of 16th September, 1789, c. 15, (1 Stat. at L. 69,) section 2, gives to vessels of North Carolina and Rhode Island the same privileges, when registered, as to vessels of the United States; section 3 lays on rum, loaf-sugar, and chocolate made in North Carolina and Rhode Island, the same duties as when imported from other foreign countries; neither North Carolina nor Rhode Island were embraced in the acts of 23d September, 1789, c. 18, to compensate the judges of the Supreme Court, (1 Stat. at L. 72,) and of 24th September, 1789, c. 20, establishing the judiciary of the United States, (1 Stat. at L. 73.) North Carolina was brought within the revenue laws by the act 8th February, 1790, § 1, c. 1, (1 Stat. at L. 99); and the Judiciary Act was extended to North Carolina, 4th June, 1790, c. 17, (1 Stat. at L 126.) And the second section of act of 16th September, 1789, was revived against Rhode Island by the first section of the act of 8th of February, 1790, (1 Stat. at L. 100.) The Census Act of the 1st March, 1790, c. 2, did not embrace her; 1 Stat. at L. 102. And on the 4th June, 1790, c. 19, (1 Stat. at L. 127,) the revenue acts were extended to Rhode Island, and by reason thereof, the thirty-ninth section of the act 1789, c. 5, ceased to operate, when she came into the Union; and on

23d June, 1790, c. 21, extended the Judiciary Act to Rhode Island; and the law of 5th July, 1790, extended to her the Census Act.

The power lodged in the Congress of the United States by Constitution, Art. 1, § 8, "to regulate commerce with foreign nations," includes all power over navigation. Gibbons *v.* Ogden, 9 Wheat. 191; The North River Steamboat Company *v.* Livingston, 3 Cowen, R. 713; United States *v.* The Brigantine William, 2 Hall's Law Journal, 265; 3 Story's Com. Const. 161; 1 Kent's Com. 405, Lec. 19. The power to regulate it "among the several States" was demanded because, during the confederacy, the States had pursued a local and selfish policy, suicidal in its tendency; and temporily sought to gain advantages over one another in trade, by favors and restrictions. Federalist, No. 42, 1 Tuck. Black Com. App. 247 to 252; President Monroe's Message, 4th May, 1822, pp. 31, 32; 2 Story's Com. Const. § 1062, p. 511. And the power to regulate it "with the Indian tribes" having been prior to the Revolution vested in the British sovereign, and having, at the Revolution, naturally flowed, subject to some restrictions, to the government under the confederacy, (Worcester *v.* State of Georgia, 6 Pet. 515; Johnson *v.* McIntosh, 8 Wheat. 543,) was finally vested, unreservedly in the United States, under the Constitution. 2 Story's Com. Const. § 1094, p. 540, 541.

(e.) The power to admit new States under the Confederation was limited to Canada (Art. 11); no other British colony was to be admitted, except by consent of nine States. The Congress of the Confederation at length induced the States to cede the Western Territory, (3 Story's Com. Const. 1311,) and the ordinance of 13th July, 1787, as to this territory, is the model hitherto used for our territorial governments. 3 Story's Com. § 1312; Webster's Speeches, January, 1830, pp. 360,–4. Missouri came into the Union by force of this ordinance, with a limit of 36° 30′ N. lat. as that, by which all territories ceded by France shall exclude slavery. Act of Congress, 6th March, 1820, 3d L. U. S. 548. See Green *v.* Biddle, 8 Wheat. R. 1, 87, 88, as to the compact between Virginia and Kentucky. Now, under the Constitution, (§ 3, art. 4; 3 Story's Com. Const. § 1308, p. 184,) the United States have power to admit new States, and their power can only be exercised by the Congress.

The power of Congress to admit new States does not include, as its incident, any power to acquire new territory by treaty, purchase, or otherwise, (the power to admit new States had reference only to the territory then belonging to the United States, 3 Story's Com. Const. § 1280,) was designed for the admission of the States, which, under the ordinance of 1787, were to be formed within its old boundaries. The purchase of Louisiana

cannot be justified as incident to the power of Congress as to common defence and general welfare. This purchase from France, by treaty of 1803, by which the United States were to pay eleven millions of dollars and to admit the inhabitants into the Union as soon as possible, was justified by President Jefferson, on the ground of the necessity to protect the commerce of the West and have the passage of the Gulf, (President's Message, pp. 105, 106, &c., 17th October, 1803,) and the power to make this purchase depends solely on its being an incident of the national sovereign power of the United States, to make war and conclude treaties, (4 Elliott's Debates, 257 to 260; American Insurance Company v. Canter, 1 Pet. S. C. R. 511, 542, 5173; Story's Com. Const. § 1281,) and the United States have incidentally the power to create corporations and territorial governments. McCulloch v. Maryland, 4 Wheat. 409, 422, 3 Story's Com. Const. 132.

The power, then, of the United States to acquire new territory does not depend upon any specific grant in the Constitution to do so, but flows from its sovereignty over foreign commerce, war, treaties, and imposts. 3 Story's Com. Const. § 1281; 4 Elliott's Debates, 257 – 260; American Insurance Company v. Canter, 1 Pet. 511 – 542, 517. The power of the United States over conquered and ceded territory is sovereign, and exclusive of State control or power, (3 Story's Com. Const. § 1251, p. 124; Hamilton's Works, vol. 1, p. 115; 4 Wheat. 420; 9 Wheat. 36, 5, 7; 3 Story's Com. Const. § 1322; except so far as the treaty, or the ordinance of 1787 may limit it. Rawle on Const. c. 27, p. 237; 1 Kent's Com. § 12, p. 243; id. § 17, pp. 359 – 360. By § 3, Art. 4 Constitution, "The Congress is empowered to dispose of and make all needful rules and regulations respecting the territory and other property belonging to the United States, and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State."

Territory acquired by the United States, by conquest or by treaty, does not, by force of our Constitution, become entitled to self-government, nor can it be subject to the jurisdiction of any State. 3 Story's Com. Const. 1318. It would be without any government at all, if it were not under the dominion and jurisdiction of the United States. American Insurance Company v. Canter, 1 Pet. S. C. R. 511, 542; id. 516. During military occupation, it is governed by military law; but when ceded by treaty, it is under the civil government of the United States; and the terms of the treaty, or statutes of the United States, are the only law that can bind it. The rights and relations of persons *inter se* remain, but the allegiance is transferred, although the

15 *

people do not share in the powers of general government, until they become a State, and are admitted as such. American Insurance Company *v.* Canter, 4 Pet. S. C. R. 511 – 543. With the transfer of the domain, the inhabitants cease to be inhabitants of the State or country that cedes the lands in question. People *v.* Godfrey, 17 Johns. R. 225; Commonwealth *v.* Young, 1 Hall's Jour. of Jurisprudence, 47. The power of the United States lodged in the Congress is supreme over all cessions, even from the several States — and no State can limit, defeat, or modify the action of the United States over such cessions, (Cohens *v.* Virginia, 6 Wheat. 264, 424 – 8; Loughborough *v.* Blake, 5 Wheat. R. 322–4,) both as to the property and as to the inhabitants; and the domain and sovereignty are distinct, and may be one or both exercised or not; hence Congress may lay a direct tax on lands in its ceded territories. 5 Wheat. 317. Congress may omit to extend a direct tax to the territories or districts owned by her, whenever a direct tax is laid on the States. 5 Wheat. 317; 3 Story's Com. Const. § 996, p. 463. The words of Art. 1 § 9, Constitution United States, do not require that such tax shall extend to the territories. 2 Story's Com. Const. § 1005, § 2, Art. 1, Const. regulates how a direct tax shall be apportioned among the States, but this does not require the territories to be taxed, although no State could be exempted.

(f.) These authorities show clearly that the domain and the sovereignty of the United States always must be distinct; and may or may not be both in full exercise at once, as is ever the case with all nations. The sovereignty of the United States is operative in foreign countries — both in war and peace her domain is local. In war, we taxed the goods brought into Tampico, in Mexico, while in our military occupancy; and also laid imposts on goods brought thence into the collection districts of the United States. Fleming *v.* Page, 9 Howard, S. C. R. 615 – 619. See Benner *v.* Porter, id. 235. In war, Great Britain, by force of arms, occupied Castine, a port within a collection district of the United States, and foreign goods were there imported during such hostile occupancy: hence, upon the abandonment of that port by the foe, the United States had no right to lay imposts on said goods, then and there found; because her sovereignty was, as to that port, in her domain, suspended by the hostile occupancy. United States *v.* Rice, 4 Wheat. 246; United States *v.* Hayward, 2 Gallison's R. 501; Grotius de Jure, B. & P. 2, c. 6, § 5; id. lib. 3, c. 6, § 4; id. c. 9, §§ 9, 14; Puffendorf lib. 7, § 5, n. 4; lib. 8, c. 11, § 8; Bynkershoek Quest. Jur. Pub. lib. 1, c. 6; 30 hhds. Sugar *v.* United States, 9 Cranch, 195; The Fama, 5 Robinson, 114, 117; Reeves's Law of Shipping, 103; Hall *v.* Campbell, Cowp. 204; see Journal H. Rep.

15th Cong. 1st Sess. p. 165; Report, dated 23d March, 1815; also Journal 15th Cong. 2d Sess. p. 61; 16th Cong. 2d Sess.; Journal, p. 140, 197; Act Cong. 19th May, 1824, 19th Cong. 1st Sess.; Report Com. of Senate, No. 23, January 23, 1826.

The sovereignty may be in full force; but the actual possession of the domain may not be enjoyed in such way as to put the power of collecting imports, &c., in force, — thus Louisiana was acquired by cession, under treaty with France of 30th April, 1803, and until the act of Congress of 24th February, 1804, took effect, no duties were taken on foreign goods imported into Louisiana. Ch. 13, 2 L. U. S. 251.

So Florida was ceded to the United States by treaty of 22d February, 1819; and on 3d March, 1821, (16th Cong. 2d Sess. c. 39, sec. 2, 3 Stat. at L. 639,) the revenue laws were extended over Florida; and in the interval no duties accrued to the United States on foreign goods imported into Florida. See the Fama, 5 Robinson, 97; 2 Robinson, 361; Jacobsen's Sea Laws, 455; 5 Robinson, 349; Opinion of Attorney-General, 359, 365, 395, case of the Olive Branch.

Under the Louisiana cession the United States claimed to 54° 40′ north latitude, embracing Oregon, and it was not until August 14th, 1848, when the revenue laws were extended to Oregon, and a port of entry established therein. See 9 Stat. at L. c. 177, p. 331, 1st Session, 30th Congress.

The territory of Washington was created, out of the same cession, a territory by act of 32d Cong. 2d Sess. c. 90, (Session Laws, 1852 – 3, 173,) but the revenue laws do not yet extend to it.

The inland and lake districts were created by acts of 1799, c. 22, 1 Stat. at L. 637, and 2 Stat. at L. 181.

The District of Minnesota, by act of 1850, c. 79, § 89, Stat. at L. 510.

Texas collected her own duties until the act of 31st December, 1845, took effect, and created collection districts therein. See 9 L. U. S. p. 2, c. 2, p. 128; id. 108; Calkin *v.* Cocke, 14 Howard, 235, 236.

The taxes laid by Great Britain on her colonies, without representation or consent, formed part of the injuries and wrongs which led to our independence. Declaration of Independence, 1 Stat. at L. 2.

Finally, duties have never been held to accrue to the United States in her newly acquired territories, until provision was made by an act of Congress for their collection; and the revenue acts always have been held to speak only as to the United States, and her territories, existing at the time when the several

acts were passed; and the decisions of the courts and acts of the executive have conformed to these views. See Letter of Gen. Jones from R. B. Mason, 19th Aug. 1848; see Walker's Circular, 7th October, 1848; President's Annual Message, Dec. 1848; Fleming & Marshall v. Page, 9 Howard, 603; Ripley v. Gelston, 9 Johnson R. 202.

And the right to exclusive power of taxation through the Congress formed one of the strongest inducements to the adoption of the Constitution of the United States. See Madison Papers, 171, 217, 224, 475, 481, 493, 540; id. 146, 297; id. 109, 218, 488; id. 403; id. 730. See, also, Elliott's Debates in Convention on Adoption of Federal Constitution, vol. 1, pp. 72, 76, 82, 83, 86 to 88, 95 to 106; id. 298, 304, 320; vol. 2, pp. 189, 461, 441, 133 to 150, 118 to 125; 2 Story's Com. Const. § 977.

And, as if more fully to evince the intention of the Congress to confine its revenue laws to the States and Territories, at the times when the respective laws are passed, and not to seem, by prospective legislation, in regard to territories not yet acquired, to hold forth the character of a conqueror, the United States have passed two acts regulating the entering of merchandise into the United States from foreign adjacent territories. See act 1821, c. 14, 3 Stat. at L. 616; and act 3d March, 1823, c. 58, 3 Stat. at L. 781.

(The argument upon the other points is omitted for want of room.)

The brief of *Mr. Cushing*, (Attorney-General,) occupied thirty printed pages. From it there will be extracted so much as relates to the first instruction asked for by the plaintiffs below.

III. — *First and second Instructions.* The bill of exceptions begins on page 8, and ends on page 138, (as before stated,) and includes the instructions moved by the plaintiffs and refused by the court, and the charge to the jury as given, pp. 136 – 137.

1. *As to both Instructions.* The first instruction, moved by the plaintiffs and refused, comprises the period from the 3d of February, 1848, the day on which the treaty of peace and cession to the United States of California was signed, to the 3d of March, 1849, the day on which the act of Congress was approved for making California a collection district and San Francisco a port of entry.

The second instruction, moved by the plaintiffs and refused by the court, comprehends the period from the 3d of March, 1849, when the act of Congress passed for making California a

collection district, to the 13th of November, 1849, when the collector, Collier, appointed under that act, arrived at San Francisco and entered upon the duties of his office.

These two instructions may be considered together; they assert, in substance, that the collections of duties by the defendant, Harrison, were illegal exactions, for which the defendant is responsible to the plaintiffs in this action ; for that, during the first period, " no duties accrued to the United States on merchandise not the production of the United States, nor on vessels not of the United States, which arrived within the limits of California ; and 'during the second period, that nobody but Collier was authorized to collect duties in California until " Collector Collier entered upon his duties as collector of the customs at the port of San Francisco."

The instructions must be considered as having been asked of the court in reference to the evidence given, and must be pertinent to that evidence, and must be the deductions of law properly arising out of the facts which the evidence conduces to prove; if not so, the court ought to refuse to give the instructions.

The court is not bound to entertain abstract propositions, nor should the judge bewilder the jury with instructions couched in language to lead them astray.

The plaintiffs' own evidence (for the defendant adduced none) proved —

1. That the foreign merchandise, and foreign vessels laden with the merchandise in question, were not only imported into California with the intent to be there unladen, but were actually unladen and landed at the port of San Francisco.

2. That the plaintiffs were warned that if the merchandise was unladen at San Francisco without the payment of duties, they would be liable to seizure and forfeiture; were left at liberty to carry the goods, wares, and merchandise to some other port in the United States, and there make entry and payment of the duties, or to pay the proper duties at San Francisco, and save the expense of going elsewhere and the forfeiture; that the plaintiffs elected to pay the duties, and did pay them voluntarily, without compulsion, without force, and for no other cause than the warning and election so given them.

3. That no other or higher duties were paid by plaintiffs and received by the defendant than were imposed by the laws of the United States.

4. That the defendant was lawfully appointed and acting under the government of California, instituted during the war between the United States and Mexico, and continued in being, operation, and effect, after the treaty of peace and cession of

the conquered territory of California to the United States, and so continued, and solely existing in fact, and in operation, during the whole period of time comprised in the instructions asked by the plaintiffs.

5. That the defendant received the duties to the use of the United states, and had "disbursed and paid out to and for the use of the United States" all the moneys received from the plaintiffs except the sums repaid to the plaintiffs for drawbacks on goods reëxported.

Upon such proof as to the mild alternative given, and the election thereupon made by the plaintiffs, and the voluntary payments of duties according to their election, no cause of action can arise to the plaintiffs unless the defendant falsely affirmed to the plaintiffs that their goods would be liable to seizure and forfeiture if landed in California without permit, and without having paid the duties accruing to the United States.

2. *As to the first Instruction separately.* The first instruction asked by plaintiffs, therefore, asserts, "that during the period from the 2d day of February, 1848, the date of the treaty of peace and limits with the Republic of Mexico, and the 3d of March, 1849, the date of the act of Congress which erected the State of California into a collection district of the United States, no duties accrued to the United States on merchandise not the production of the United States, which arrived within the limits of California ceded by said treaty," and applying that instruction to the facts that the goods, and vessels wherein they were laden, were imported into California with intent to be unladen, and were actually there landed, it asserts that the said goods, and the vessels from which they were so unladen, were not liable to seizure and forfeiture if the duties were unpaid.

The error of those propositions of the plaintiffs is proved by inspection of the following statutes :

Act of July 30, 1846, 9 Statutes at Large, 42, c. 74; Act of July 20, 1790, 1 Statutes at Large, 135, c. 30, for imposing duties of tonnage on ships and vessels; and of January 14, 1817; 3 Ib. 345, c. 3, supplementary to an act to regulate the collection of duties on imports and tonnage. Act of March 2, 1799: "An act to regulate the collection of duties on imports and tonnage." 1 Statutes at Large, 639, c. 22 §§ 18, 92.

The first act above mentioned, of July 30, 1846, enacts, "That from and after the first day of December next, in lieu of the duties heretofore imposed by law on the articles hereinafter mentioned, and on such as may be now exempt from duty, there shall be levied and collected and paid on the goods, wares, and

merchandise herein enumerated and provided for, imported from foreign countries, the following rates of duty — that is to say," &c.

This is the tariff of duties by which the plaintiffs paid the moneys to the defendant.

The second and third acts before cited, imposing duties of tonnage on ships and vessels, need not be recited.

The 18th section of the act of March 2d, 1799 — to regulate the collection on imports and tonnage, before cited, (vol. 1, 639) — enacts, " That it shall not be lawful to make entry of any ship or vessel which shall arrive from any foreign port or place within the United States, or of the cargo on board such ship or vessel, elsewhere than at one of the ports of entry, . . . nor to unlade the said cargo or any part thereof elsewhere than at one of the ports of delivery" established by law: " Provided, always, that every port of entry shall be also a port of delivery."

Section 62 prohibits any permit for the landing of goods to be granted until the duties thereon are paid or secured to be paid.

Section 63 prohibits any permit to be granted for unlading a vessel until the tonnage duty thereon is paid.

" Section 92. That except into the districts herein before described on the northern, northwestern, and western boundaries of the United States, adjoining to the dominions of Great Britain in Upper and Lower Canada, and the districts on the rivers Ohio and Mississippi, no goods, wares, or merchandise of foreign growth or manufacture, subject to the payment of duties, shall be brought into the United States from any foreign port or place in any other manner than by sea, nor in any ship or vessel of less than thirty tons burden, agreeably to the admeasurement hereby directed for ascertaining the tonnage of ships or vessels; nor shall be landed or unladen at any other port than is directed by this act, under the penalty of seizure and forfeiture of all such ships or vessels, and of the goods, wares, or merchandise imported therein, landed or unladen in any other manner. And no drawback of any duties on goods, wares, or merchandise, of foreign growth or manufacture shall be allowed on the exportation thereof from any district of the United States, otherwise than by sea and in vessels not less than thirty tons burden."

This act of 1799, in its various sections, and particularly in sections 18, 62, 63, and 92, taken together, protect the revenue from being evaded or defrauded by importing and landing goods in the United States at ports or places where the United States have not established a port of entry or delivery,

and likewise from the landing of goods even at a port of entry or of delivery without a permit, which permit cannot be granted until the duties on imports and tonnage have been paid or secured to be paid.

The defendant therefore truly informed the plaintiffs that their goods, if landed at San Francisco without permit and payment of duties, would be liable to seizure and forfeiture, and the vessel also from which such unlawful unlading was effected. The first instruction asked is totally erroneous in supposing that no duties would accrue to the United States upon foreign goods nor upon foreign vessels arriving in California, and there unlading their cargoes between February 2, 1848, and March 3, 1849. It is a most egregious blunder to assert, that after the United States had acquired California by treaty, and before they had provided by after law for a collection district, and a collector in that country, the citizens of the United States and foreigners might lawfully inundate the country with foreign goods, wares, and merchandise, without incurring any liabilities for duties on imports and tonnage; that the former laws and government ceased *eo instante* upon the treaty of peace and cession; and that there was no law, no government, no order there until the Congress of the United States had legislated, and the executive department had acted in pursuance of such new legislation upon the new state of things growing out of the war and the ensuing peace.

In so far as the revenue from duties on imports and tonnage was concerned, in the acquisition of Upper California, the act of 1799 had effectually provided against the importation of foreign dutiable goods into that country, and landing them there free of duty. And the existing government and its laws and officers provided the means of causing these revenue laws to be respected and obeyed until the Congress of the United States had provided the proper officers of the customs adapted to the new state of things.

Before the treaty, and under the government instituted and existing in fact in Upper California, duties of import and tonnage were levied and collected, and a system for the collection of those duties was in full, actual, effective operation, sanctioned by the President of the United States, the civil and military governor of the territory, supported by the naval force of the United States in the Pacific Ocean, and by the army of the United States then in California. The defendant Harrison was the collector of customs appointed by the then existing government, and acted in obedience to the laws and instructions of that government.

Upon the cession of California to the United States, "the

laws, whether in writing or evidenced by the usage and customs of the ceded country," continued in force until altered by the new sovereign.  Strother *v.* Lucas, 12 Peters, 436; Mitchell *v.* United States, 9 Peters, 749.

Such is the law of nations.  Vattel, edition 1853, 358.  So it is by the common law.

Lord Mansfield lays it down as the doctrine of the common law, that conquered (and, of course, also ceded) States retain their old laws until the conqueror thinks fit to alter them.  Rex *v.* Vaughan, 4 Burr. 2500.  See also Calvin's case, 7 Coke, 176; Blankard *v.* Galdy, 2 Salk. 411; S. C. 2 Mod. 222; Attorney-General *v.* Stewart, 2 Meriv. 154; Hall *v.* Campbell, Cowp. 209; Gardiner *v.* Fell, 1 Jac. & W. 27; Anon. 2 P. Williams, 76; Spragge *v.* Stone, cited, Doug. 38; Ex parte Prosser, 2 Br. C. C. 325; Ex parte Anderson, 5 Ves. 240; Evelyn *v.* Forster, 8 Ves. 96; Sheddon *v.* Goodrich, 8 Ves. 482; Elphinstone *v.* Bedreechund, Knapp's P. C. R. 338; Mostyn *v.* Fabrigas, Cowp. 165; 4 Com. Dig. Ley. (C.)

The first instruction, so moved by the plaintiffs, was an improper deduction of law from the facts proved by the plaintiffs' own evidence, oral and documentary, conducing, if given, to confuse and mislead the jury, and was therefore properly overruled.

Mr. Justice WAYNE delivered the opinion of the court.

This case comes up, by writ of error, from the Circuit Court of the United States for the Southern District of New York.

It was an action brought by Cross, Hobson and Company against Harrison, for the return of duties alleged to be illegally exacted by Harrison whilst he was acting as collector of the customs at the port of San Francisco, in California.  The claim covered various amounts of money which were paid at intervals between the 3d day of February, 1848, and the 13th of November, 1849.  The first of these dates was that of the treaty of peace between the United States and Mexico, and the latter when Mr. Collier, a person who had been regularly appointed collector at that port, entered upon the performance of the duties of his office.  During the whole of this period it was alleged by the plaintiffs that there existed no legal authority to receive or collect any duty whatever accruing upon goods imported from foreign countries.

The period of time above mentioned was subdivided by the plaintiffs in the prayers which they made to the court below, into two portions, to each of which they supposed that different rules of law attached.  The three periods may be stated as follows:

3d of February, 1848, the date of the treaty of peace between the United States and Mexico. 9 Stat. at Large, 922 to 943.

3d of March, 1849, when the act of Congress was passed, including San Francisco within one of the collection districts of the United States. And

13th of November, 1849, when Collector Collier entered upon the duties of his office.

In order to show what was the state of things on the 3d of February, 1848, it is necessary to refer to some of the public documents which were offered in evidence by the plaintiffs, being Senate Document No. 18 of the first session of the thirty-first Congress.

On the 19th of August, 1847, H. W. Halleck, signing himself " Lieutenant of Engineers and Secretary of State for the Territory of California," issued a circular to certain persons who had been appointed collectors of the customs, in which he recited that the commander-in-chief of the naval forces had been authorized by the President of the United States to establish port regulations, to prescribe the conditions under which American and foreign vessels might be admitted into the ports of California, and also to regulate the import duties. The circular then prescribed certain rules which were to be observed.

On the 15th of September, 1847, Commodore Shubrick prescribed certain rates, or scales of duties, which were confirmed on the 14th of the ensuing October, by R. B. Mason, who signed himself Colonel of the 1st dragoons and Governor of California.

On the 20th of October, 1847, Colonel Mason, still styling himself Governor of California, issued an order saying, that "recent instructions from the President of the United States made the officers of the army and navy the collectors of the customs in California." The arrangement was made accordingly.

This was the state of things up to the 3d of February, 1848; the first epoch mentioned by the plaintiffs in their prayers to the court. The war tariff was collected by officers of the army and navy.

On the 3d of February, 1848, a treaty of peace was signed between the United States and Mexico, the ratifications of which were exchanged on the 30th of May ensuing. Some alterations were made in the mode of collecting the revenue during this second period of time, namely, between the 3d of February, 1848, and 3d of March, 1849, which it is necessary to notice.

On the 26th of July, 1848, Colonel Mason, still calling himself Governor of California, issued a number of regulations for

the government of the custom-house, amongst which the following two may be mentioned:

"7. If any master of a vessel shall be detected in landing, or attempting to land, anywhere in California, any goods or merchandise, without permit from a collector, he shall be fined for every such offence in the sum of five hundred dollars, and the goods or merchandise so landed, or attempted to be landed, and the boat or boats through which such landing is effected or attempted, shall be seized, forfeited, and sold by the nearest collector.

"8. If any person or persons other than the master of a vessel shall be detected in landing, or attempting to land, anywhere in California, any goods or merchandise, without permit from a collector, he or they shall be fined in the sum of one hundred dollars, and the goods or merchandise so landed, or attempted to be landed, and the boat or boats through which such landing is effected or attempted, shall be seized, forfeited, and sold by the nearest collector."

On the 7th of August, 1848, a proclamation was issued to the people of California, by R. B. Mason, the governor, announcing the ratification of the treaty of peace, by which Upper California was ceded to the United States.

On the 9th of August, H. W. Halleck, lieutenant of engineers and Secretary of State, wrote to Captain Folsom, the collector of the customs at San Francisco, directing him to perform the duties until further orders, but announcing that he would be relieved as soon as some suitable citizen could be found to be appointed his successor. In the mean time he was told "the tariff of duties for the collection of military contributions will immediately cease, and the revenue laws and tariff of the United States will be substituted in its place."

In order to illustrate the view which Colonel Mason took of his position, it may be proper to insert the following extract from a letter written by him to the War Department on the 14th of August, 1848:

"In like manner, if all customs were withdrawn, and the ports thrown open free to the world, San Francisco would be made the depôt of all the foreign goods in the north Pacific, to the injury of our revenue and the interests of our own merchants. To prevent this great influx of foreign goods into the country duty free, I feel it my duty to attempt the collection of duties according to the United States Tariff of 1846. This will render it necessary for me to appoint temporary collectors, &c., in the several ports of entry, for the military force is too much reduced to attend to those duties.

"I am fully aware that, in taking these steps, I have no fur-

ther authority than that the existing government must necessarily continue until some other is organized to take its place, for I have been left without any definite instructions in reference to the existing state of affairs.  But the calamities and disorders which would surely follow the absolute withdrawal of even a show of authority, impose on me, in my opinion, the imperative duty to pursue the course I have indicated, until the arrival of despatches from Washington (which I hope are already on their way) relative to the organization of a regular civil government.  In the mean time, however, should the people refuse to obey the existing authorities, or the merchants refuse to pay any duties, my force is inadequate to compel obedience."

On the 3d of September, 1848, Governor Mason appointed Edward H. Harrison temporary collector of the port of San Francisco, with a salary of two thousand dollars per annum, provided that so much was collected over and above the expenses of the custom-house.

In order further to illustrate the view which was taken by the Executive branch of the government, of the existing condition of things in California, it is proper to insert an extract from a despatch written by Mr. Buchanan, Secretary of State, to Mr. Voorhees, on the 7th of October, 1848.  It is as follows:

" The President, in his annual message, at the commencement of the next session, will recommend all these great measures to Congress in the strongest terms, and will use every effort, consistent with his duty, to insure their accomplishment.

" In the mean time, the condition of the people of California is anomalous, and will require, on their part, the exercise of great prudence and discretion.  By the conclusion of the Treaty of Peace, the military government which was established over them under the laws of war, as recognized by the practice of all civilized nations, has ceased to derive its authority from this source of power.  But is there, for this reason, no government in California?  Are life, liberty, and property under the protection of no existing authorities?  This would be a singular phenomenon in the face of the world, and especially among American citizens, distinguished as they are above all other people for their law-abiding character.  Fortunately, they are not reduced to this sad condition.  The termination of the war left an existing government, a government *de facto*, in full operation, and this will continue, with the presumed consent of the people, until Congress shall provide for them a territorial government.  The great law of necessity justifies this conclusion. The consent of the people is irresistibly inferred from the fact that no civilized community could possibly desire to abrogate

an existing government, when the alternative presented would be to place themselves in a state of anarchy, beyond the protection of all laws, and reduce them to the unhappy necessity of submitting to the dominion of the strongest.

" This government *de facto* will, of course, exercise no power inconsistent with the provisions of the Constitution of the United States, which is the supreme law of the land. For this reason no import duties can be levied in California on articles the growth, produce, or manufacture of the United States, as no such duties can be imposed in any other part of our Union on the productions of California. Nor can new duties be charged in California upon such foreign productions as have already paid duties in any of our ports of entry, for the obvious reason that California is within the territory of the United States. I shall not enlarge upon this subject, however, as the Secretary of the Treasury will perform that duty "

At the same time, despatches were issued by the War and Treasury Departments to their respective officers, of similar import to the above. Mr. Walker, the Secretary of the Treasury, after providing for the reciprocal admission of goods which were the growth, &c., of California and the United States, free of duty, into the ports of each, thus provided for the case under consideration, so as to protect the revenue : " Third. Although the Constitution of the United States extends to California, and Congress have recognized it by law as a part of the Union, and legislated for it as such, yet it is not brought by law within the limits of any collection district, nor has Congress authorized the appointment of any officers to collect the revenue accruing on the import of foreign dutiable goods into that territory. Under these circumstances, although this department may be unable to collect the duties accruing on importations from foreign countries into California, yet, if foreign dutiable goods should be introduced there, and shipped thence to any port or place of the United States, they will be subject to duty, as also to all the penalties prescribed by law when such importation is attempted without the payment of duties. R. J. WALKER,
*Secretary of the Treasury.*" 

When these papers reached California, some doubt was entertained whether or not the revenue laws would be enforced, and application was made to Commodore Jones, then commanding the naval forces in the Pacific, to know whether he would use the forces under his command to aid the collector in seizing and confiscating goods, &c.; to which the commodore replied that he would so employ the force under his command.

On the 23d of February, 1849, Cross, Hobson, and Company
16 *

protested against the payment of $105.62, duties which accrued upon an importation by the French bark Staonele, and also protested against the payment of duties upon all other importations, past, present, or to come.

In order still further to explain the views of those who administered the government in California, it may be proper to introduce another extract from instructions which were issued on the 2d of February, 1849, by H. W. Halleck, Secretary of State, to Mr. Harrison, the collector, namely:

" This view of the subject presents a ready reply to the questions proposed in your letter.　No vessel can demand as a right to enter any foreign dutiable goods here, and you will not be liable to prosecution for refusing such entry; and by a voluntary payment of her duties here, in preference to going to a regularly established port of entry, such vessel binds herself to abide by the revenue laws of the United States, in the absence of all instructions to the contrary."

On the 3d of March, 1849, (another of the periods of time mentioned in the prayers to the court,) Congress passed an act (9 Stat. at Large, 400,) making the port of San Francisco a collection district.

On the 13th of November, 1849, Collector Collier, who had been regularly appointed, entered upon the execution of his duty at San Francisco.　This was the third period referred to in the prayers to the court.

In April, 1851, Cross, Hobson, and Company brought an action of trespass on the case in the Circuit Court of the United States for the Southern District of New York, against Edward H. Harrison, to recover sundry sums of money paid, under the above protest, for duties upon goods imported into San Francisco, during the period between the 3d of February, 1848, and the 12th of November, 1849.

Upon the trial, the jury, under the instructions of the court found a verdict for the defendant.

The bill of exceptions contained the deposition of sundry persons as to the payment and other facts in the case, and also the whole of the Senate Document above mentioned.

The counsel for the plaintiffs then rested; and the counsel for the plaintiffs thereupon prayed the court to charge and instruct the jury, as matter of law, as follows:

1. That during the period from the 3d day of February, 1848, the date of the treaty of peace and limits with the republic of Mexico, and the 3d of March, 1849, the date of the act of Congress which erected the State of California into a collection district of the United States, no duties accrue to the United States on merchandise not the production of the United States, nor of

vessels not of the United States which arrived within the limits of California, ceded by said treaty to the United States, and that the exaction by the defendant of such alleged duties on such goods imported into California by the plaintiffs within said period was not authorized by any law of the United States, and was therefore illegal.

2. That during the period from the 3d of March, 1849, when the act of Congress erected the State of California into a collection district, and the 13th of November, 1849, when Collector Collier entered upon his duties as collector of customs at the port of San Francisco, in said district, the exaction of alleged duties to the United States, by the defendant, was not authorized by any law of the United States, and was therefore illegal, unless the jury shall find that the defendant was legally appointed and qualified to act as collector of the customs at San Francisco.

3. That if the jury shall find that on the 23d February, 1849, the plaintiffs made their written protest against all exactions that then were or thereafter should be made by said defendant, as unauthorized by any act of Congress and illegal, and that moneys then and thenceforward were demanded as alleged duties to the United States by said defendant, and were paid under coercion of military power and duress, and not in pursuance of any law of the United States, that then such exactions were unauthorized and illegal, and the jury must find for the plaintiffs.

4. That if the jury shall find from the evidence that alleged duties were exacted by the defendant from the plaintiffs between the 3d February, 1848, and the 12th November, 1849, by coercion and duress, and against their remonstrance and protest, that then the plaintiffs are entitled to the customary interest of California upon such exactions.

Whereupon the court, *pro forma*, then and there charged and instructed the jury in conformity with the following prayers, in conformity with which the defendant's counsel insisted and prayed the court to instruct the jury as matters of law:

1. That between the 3d February, 1848, and the 3d March, 1849, duties did accrue to the United States, on foreign merchandise, not the production of the United States, and on foreign vessels not of the United States, which were imported into and arrived within the limits of California, as ceded to the United States by the treaty of peace and limits with the Republic of Mexico, signed at Guadaloupe Hidalgo.

2. That after the act of 3d March, 1849, erecting the State of California into a collection district of the United States, took effect, duties accrued to the United States, both on foreign mer-

chandise, not the production of the United States, and on foreign vessels not of the United States, imported and brought within the limits of such collection district.

3. That if, from the evidence in the cause, the jury shall find that between the 3d February, 1848, and 12th November, 1849, the plaintiffs were allowed by the defendant to enter their said foreign goods and vessels at another port of the United States within a collection district, and thereafter to land the same at San Francisco without further exaction of duties, and that the plaintiffs neglected so to do, and elected to enter and land the same at San Francisco, and pay duties thereon, and that the duties were paid by defendant to the use of the United States, that then the said payment of duties was voluntary and not coercive, and the jury must find for the defendant.

4. That if the jury shall find that the plaintiffs paid duties to the defendant on foreign merchandise, and on foreign vessels, not of the United States, between the 3d February, 1848, and 12th November, 1849, and that such payments were illegal but voluntary, and made through mistake of law, then the plaintiffs are not entitled to interest upon such exactions, and that upon the whole evidence the payments aforesaid were voluntary and not coercive.

And the court further, *pro forma*, refused to instruct and charge the jury in conformity with the points insisted upon by the plaintiffs' counsel, and in conformity with which he had prayed the court to charge and instruct the jury as aforesaid.

Upon this exception, the case came up to this court.

This statement presents the case of the plaintiffs as strongly as it can be made from the record, and that contains every fact and document having any connection with the subject. The cause has been argued here with much research. Every argument has been brought to bear upon it by counsel on both sides, which can enter into its consideration. It seems, from the institution of the suit, until now, to have been conducted with the wish upon the part of the United States to give to the plaintiffs every opportunity to establish their claim judicially, if that could be done; and with a desire upon its part to obtain from this court a decision as to what are the rights of the United States in respect to tonnage and impost duties, in such a conjuncture as that was, when California was ceded by treaty to the United States, before Congress had authorized such duties to be collected there by a special act. We have received much assistance from the argument, and make the acknowledgment the more readily because it has enabled us to come to conclusions which we believe will be satisfactory, though adverse from the claim of the plaintiffs.

The purpose of the suit is to recover from the defendant certain tonnage duties and imposts which were paid to him by the plaintiffs upon ships which had arrived in San Francisco, and upon foreign merchandise landed there from them, between the 3d February, 1848, and the 13th November, 1849. Harrison had been appointed collector for the port of San Francisco by Colonel Mason, military governor of California. He told the plaintiffs, officially, that he would not permit them to land their goods without the payment of duties; stating if they attempted to do so, without having made an entry of them, that they would be seized and forfeited. He placed an inspector of the customs on board of the vessels of the plaintiffs, to prevent any merchandise from being landed from them without permits and entries, and when they complained that the duties which they were required to pay were illegal exactions, which they protested against, the collector refused to receive the duties under protest, and told the plaintiffs that they might enter their ships at some other port in the United States, and then discharge their goods at San Francisco. That he considered San Francisco a port in the United States at which foreign goods could not be landed without the payment of duties. It is as well to remark here, though the same fact appears in our statement of the case already given, that the duties for which the plaintiffs sue were paid by them between the 3d February, 1848, and the 12th November, 1849. They were paid, however, until some time in the fall of 1848, at the rate of the war tariff; which had been established early in the year before by the direction of the President of the United States.

The authority for that purpose given to the commander-in-chief of our naval force on that station, was, to establish port regulations, to prescribe the conditions upon which American and foreign vessels were to be admitted into the ports of California, and to regulate import duties. That war tariff, however, was abandoned as soon as the military governor had received from Washington information of the exchange and ratification of the treaty with Mexico, and duties were afterwards levied in conformity with such as Congress had imposed upon foreign merchandise imported into the other ports of the United States, Upper California having been ceded by the treaty to the United States. This last was done with the assent of the Executive of the United States, or without any interference to prevent it. Indeed, from the letter of the then Secretary of State, and from that of the Secretary of the Treasury, we cannot doubt that the action of the military governor of California was recognized as allowable and lawful by Mr. Polk and his cabinet. We think it was a rightful and correct recog-

nition under all the circumstances, and when we say rightful, we mean that it was constitutional, although Congress had not passed an act to extend the collection of tonnage and import duties to the ports of California.

California, or the port of San Francisco, had been conquered by the arms of the United States as early as 1846. Shortly afterward the United States had military possession of all of Upper California. Early in 1847 the President, as constitutional commander-in-chief of the army and navy, authorized the military and naval commander of our forces in California to exercise the belligerent rights of a conqueror, and to form a civil government for the conquered country, and to impose duties on imports and tonnage as military contributions for the support of the government, and of the army which had the conquest in possession. We will add, by way of note to this opinion, references to all of the correspondence of the government upon this subject; now only referring to the letter of the Secretary at War to General Kearney, of the 10th of May, 1847, which was accompanied with a tariff of duties on imports and tonnage, which had been prepared by the Secretary of the Treasury, with forms of entry and permits for landing goods, all of which was reported by the Secretary to the President on the 30th of March, 1847. Senate Doc. No. 1, 1st session, 30th Congress, 1847, pp. 567, 583. No one can doubt that these orders of the President, and the action of our army and navy commander in California, in conformity with them, was according to the law of arms and the right of conquest, or that they were operative until the ratification and exchange of a treaty of peace. Such would be the case upon general principles in respect to war and peace between nations. In this instance it is recognized by the treaty itself. Nothing is stipulated in that treaty to be binding upon the parties to it, or from the date of the signature of the treaty, but that commissioners should be appointed by the general-in-chief of the forces of the United States, with such as might be appointed by the Mexican government, to make a provisional suspension of hostilities, that, in the places occupied by our arms, constitutional order might be reëstablished as regards the political, administrative, and judicial branches in those places, so far as that might be permitted by the circumstances of military occupation. All else was contingent until the ratifications of the treaty were exchanged, which was done on the 30th of May, 1848, at Queretaro; and there is in the 3d article of the treaty a full recognition by Mexico of the belligerent rights exercised by the United States during the war in its ports which had been conquered. In that article, besides other things provided for, it was stipulated that

the United States, upon the ratifications of the treaty by the two republics, should despatch orders to all persons in charge of the custom houses at all ports occupied by the forces of the United States, to deliver possession of the same to persons authorized by Mexico to receive them, together with all bonds and evidences of debts for duties on importations and exportations not yet fallen due, and that an exact account should be made out, showing the entire amount of all duties on imports and exports collected at such custom houses or elsewhere in Mexico by the authority of the United States after the ratification of the treaty by Mexico, with the cost of collection, all of which was to be paid to the Mexican government, at the city of Mexico, within three months after the exchange of ratifications, subject to a deduction of what had been the cost of collection.

The plaintiffs therefore can have no right to the return of any moneys paid by them as duties on foreign merchandise in San Francisco up to that date.  Until that time California had not been ceded, in fact, to the United States, but it was a conquered territory, within which the United States were exercising belligerent rights, and whatever sums were received for duties upon foreign merchandises, they were paid under them.

But after the ratification of the treaty, California became a part of the United States, or a ceded, conquered territory.  Our inquiry here is to be, whether or not the cession gave any right to the plaintiffs to have the duties restored to them, which they may have paid between the ratifications and exchange of the treaty and the notification of that fact by our government to the military governor of California.  It was not received by him until two months after the ratification, and not then with any instructions or even remote intimation from the President that the civil and military government, which had been instituted during the war, was discontinued.  Up to that time, whether such an intimation had or had not been given, duties had been collected under the war tariff, strictly in conformity with the instructions which had been received from Washington.

It will certainly not be denied that those instructions were binding upon those who administered the civil government in California, until they had notice from their own government that a peace had been finally concluded.  Or that those who were locally within its jurisdiction, or who had property there, were not bound to comply with those regulations of the government, which its functionaries were ordered to execute.  Or that any one could claim a right to introduce into the territory of that government foreign merchandise, without the payment of duties which had been originally imposed under belligerent

rights, because the territory had been ceded by the original possessor and enemy to the conqueror. Or that the mere fact of a territory having been ceded by one sovereignty to another, opens it to a free commercial intercourse with all the world, as a matter of course, until the new possessor has legislated some terms upon which that may be done. There is no such commercial liberty known among nations, and the attempt to introduce it in this instance is resisted by all of those considerations which have made foreign commerce between nations conventional. "The treaty that gives the right of commerce, is the measure and rule of that right." Vattel, c. 8, § 93. The plaintiffs in this case could claim no privilege for the introduction of their goods into San Francisco between the ratifications of the treaty with Mexico and the official annunciation of it to the civil government in California, other than such as that government permitted under the instructions of the government of the United States.

We must consider them as having paid the duties upon their importations voluntarily, notwithstanding that they protested against the right of the collector to exact them. Their protest was made from a misconception of the principles applicable to the circumstances under which those duties were claimed, and from their misapprehension of what were the commercial consequences resulting from the treaty of peace with Mexico and the cession of California to the United States. That treaty gave them no right to carry foreign goods there upon which duties had not been paid in one of our ports of entry. The best test of the correctness of what has just been said is this: that if such goods had been landed there duty free, they could not have been shipped to any other port in the United States without being liable to pay duty.

Having considered and denied the claim of the plaintiffs to a restoration of the duties paid by them from the date of the treaty up to the time when official notice of its ratification and exchange were received in California, we pass on to the examination of their claim from that time until the revenue system in respect to tonnage and import duties had been put into practical operation in California, under the act of Congress passed for that purpose. The ratification of the treaty of peace was proclaimed in California, by Colonel Mason, on the 7th of August, 1848. Up to this time it must be remembered that Captain Folsom, of the quartermaster's department of the army, had been the collector of duties under the war tariff. On the 9th of August, he was informed by Lieutenant Halleck, of the engineer corps, who was the Secretary of State of the civil government of California, that he would be relieved as soon as

a suitable citizen could be found for his successor. . He was also told that " the tariff of duties for the collection of military contributions was immediately to cease, and that the revenue laws and tariff of the United States will be substituted in its place." The view taken by Governor Mason, of his position, has been given in our statement. The result was to continue the existing government, as he had not received from Washington definite instructions in reference to the existing state of things in California.

His position was unlike any thing that had preceded it in the history of our country. The view taken of it by himself has been given in the statement in the beginning of this opinion. It was not without its difficulties, both as regards the principle upon which he should act, and the actual state of affairs in California. He knew that the Mexican inhabitants of it had been remitted by the treaty of peace to those municipal laws and usages which prevailed among them before the territory had been ceded to the United States, but that a state of things and population had grown up during the war, and after the treaty of peace, which made some other authority necessary to maintain the rights of the ceded inhabitants and of immigrants, from misrule and violence. He may not have comprehended fully the principle applicable to what he might rightly do in such a case, but he felt rightly, and acted accordingly. He determined, in the absence of all instruction, to maintain the existing government. The territory had been ceded as a conquest, and was to be preserved and governed as such until the sovereignty to which it had passed had legislated for it. That sovereignty was the United States, under the Constitution, by which power had been given to Congress to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States, with the power also to admit new States into this Union, with only such limitations as are expressed in the section in which this power is given. The government, of which Colonel Mason was the executive, had its origin in the lawful exercise of a belligerent right over a conquered territory. It had been instituted during the war by the command of the President of the United States. It was the government when the territory was ceded as a conquest, and it did not cease, as a matter of course, or as a necessary consequence of the restoration of peace. The President might have dissolved it by withdrawing the army and navy officers who administered it, but he did not do so. Congress could have put an end to it, but that was not done. The right inference from the inaction of both is, that it was meant to be continued until it had been legislatively changed. No presumption

of a contrary intention can be made. Whatever may have been the causes of delay, it must be presumed that the delay was consistent with the true policy of the government. And the more so as it was continued until the people of the territory met in convention to form a State government, which was subsequently recognized by Congress under its power to admit new States into the Union.

In confirmation of what has been said in respect to the power of Congress over this territory, and the continuance of the civil government established as a war right, until Congress acted upon the subject, we refer to two of the decisions of this court, in one of which it is said in respect to the treaty by which Florida was ceded to the United States: " This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities, of the citizens of the United States. It is unnecessary to inquire whether this is not their condition, independently of stipulations. They do not however participate in political power — they do not share in the government until Florida shall become a State. In the mean time Florida continues to be a territory of the United States, guarded by virtue of that clause in the Constitution which empowers Congress to make all needful rules and regulations respecting the territory or other property belonging to the United States. Perhaps the power of governing a territory belonging to the United States, which has not, by becoming a State, acquired the means of self-government, may result necessarily from the facts that it is not within the jurisdiction of any particular State, and is within the power and jurisdiction of the United States. The right to govern may be the natural consequences of the right to acquire territory." American Insurance Co. *v.* Canter, 1 Peters, 542, 543.

The court, afterwards, in the case of the United States *v.* Gratiot, 14 Peters, 526, repeats what it said in the case of Canter in respect to that clause of the Constitution giving to Congress the power to make all needful rules and regulations respecting the territory or other property of the United States.

Colonel Mason was fortunate in having his determination to continue the existing government sustained by the President of the United States and the Secretaries of his cabinet. And nothing but an almost willing misunderstanding of the circular of the Secretary of the Treasury, Mr. Walker, could have caused a doubt as to the liability of the importers of foreign goods into California to pay duties upon them. That part of the Secretary's circular relating to duties is in our statement of the case. It will show that the Secretary says no more than this: that as Congress had not brought California by law within the limits

of any collection district, or authorized the appointment of offi-
cers to collect the revenue accruing upon the importation of
foreign dutiable goods into that territory, that his department
may be unable to collect them. Revenue accruing upon the
importation into California of foreign dutiable goods, means
that the goods were liable to pay the duty. There is nothing
uncertain in the Secretary's circular. It does not warrant in
any way the declaration that it was his opinion that the goods
were not dutiable, or that they might not be legally collected,
though that could not be done by the instrumentality of officers
of a collection district. Our conclusion, from what has been
said, is, that the civil government of California, organized as it
was from a right of conquest, did not cease or become defunct
in consequence of the signature of the treaty or from its ratifi-
cation. We think it was continued over a ceded conquest,
without any violation of the Constitution or laws of the United
States, and that until Congress legislated for it, the duties upon
foreign goods imported into San Francisco were legally de-
manded and lawfully received by Mr. Harrison, the collector of
the port, who received his appointment, according to instruc-
tions from Washington, from Governor Mason.

But it was assumed in the argument, and not without force
and ingenuity, and with some appearance of authority, that
duties did not accrue to the United States upon foreign goods
brought into California between the 3d of February, 1848, and
the 3d of March, 1849, and from the last date until the 12th of
November, 1849 ; and that the exaction of them was illegal.
The two first dates mentioned, comprehend the time between
the date of the treaty and the date of the act of Congress which
included California within one of the collection districts of the
United States, and the other date comprehends the time from
the date of the act of Congress until Mr. Collier, the collector,
entered upon the duties of his office. It was also said by
counsel, that as there was no treaty or law enjoining or permit-
ting the collection of the duties, that the exaction of them by
the defendant was illegal. It was said, that the duties were
illegally exacted, because the laws of a ceded country, including
those of trade, remained unchanged until the new sovereignty
of it changed them, and that this Congress had not done.
That the practice of the United States had been, not to collect
duties upon importations upon goods brought into a ceded ter-
ritory, until Congress passed an act for it to be done. Louisiana
and Florida were the instances cited ; and the ratification by
North Carolina and Rhode Island of the Constitution of the
United States, were also mentioned as having been the sub-
jects of special legislation to bring them within the operation
of the revenue laws which had been passed by Congress.

And it was said, that as Congress has the constitutional power to regulate commerce, and had not done so specifically in respect to tonnage and import duties in California, that none of the existing acts of Congress, for such purposes, could be applied there until Congress had passed an act giving to them operation, and had legislated California into a collection district, with denominated ports of entry.

This last being the most important of the objections which were made, we will examine it first, and afterwards notice those which precede it. The objection assumes, that, under the laws then in force, duties could not be collected in California after the war with Mexico had been concluded by a treaty of peace; and that the President had no legal authority to order the collection of duties there upon foreign goods, or power to enforce any revenue regulations, or to prevent the landing of goods prior to the passage of the act, by which our revenue laws were extended to California, and before proper officers had been appointed to execute those laws. It has already been shown, that for seven months of the time the duties received were paid under the war tariff, and that the treaty, though signed in 1848, did not become operative until the ratifications and exchanges of it. And further, that it could not have any effect upon the existing government of California, until official information of those ratifications had been received there. The belligerent right of the United States to make a civil government in California when it was done, and to authorize it to collect tonnage and impost duties whilst the war continued, is admitted.

It was urged, that our revenue laws covered only so much of the territory of the United States as had been divided into collection districts, and that out of them no authority had been given to prevent the landing of foreign goods or to charge duties upon them, though such landing had been made within the territorial limits of the United States. To this it may be successfully replied, that collection districts and ports of entry are no more than designated localities within and at which Congress had extended a liberty of commerce in the United States, and that so much of its territory as was not within any collection district, must be considered as having been withheld from that liberty. It is very well understood to be a part of the laws of nations, that each nation may designate, upon its own terms, the ports and places within its territory for foreign commerce, and that any attempt to introduce foreign goods elsewhere, within its jurisdiction, is a violation of its sovereignty. It is not necessary that such should be declared in terms, or by any decree or enactment, the expressed allowances being the limit of the liberty given to foreigners to trade with such nation.

Upon this principle, the plaintiffs had no right of trade with California with foreign goods, excepting from the permission given by the United States under the civil government and war tariff which had been established there. And when the country was ceded as a conquest, by a treaty of peace, no larger liberty to trade resulted. By the ratifications of the treaty, California became a.part of the United States. And as there is nothing differently stipulated in the treaty with respect to commerce, it became instantly bound and privileged by the laws which Congress had passed to raise a revenue from duties on imports and tonnage. It was bound by the eighteenth section of the act of 2d of March, 1799. The fair interpretation of the second member of the first sentence of that section is, that ships coming from foreign ports into the United States were not to be permitted to land any part of their cargoes in any other than in a port of delivery, confined then to the ports mentioned in the act; afterward applicable to all other places which might be made ports of entry and delivery, and excluding all right to unlade in any part of the United States which had not been made a collection district with ports of entry or delivery. The ninety-second section of that act had four objects in view. First, to exclude foreign goods subject to the payment of duties from being brought into the United States, except in the localities stated, otherwise than by sea. Next, that they were not to be brought by sea in vessels of less than thirty tons burden. And third, to subject to forfeiture any foreign goods which might be landed at any other port or place in the United States than such as were designated by law. Fourth, to exclude the allowances of drawback of any duties on foreign goods exported from any district in the United States otherwise than by sea, and in vessels less than thirty tons burden. The sixty-third section also of that act, directing when tonnage duties were to be paid, became as operative in California after its cession to the United States, as it was in any collection district.

The acts of the 20th July, 1790, (1 Stat. at Large, 130, c. 30,) and that of 2d March, 1799, (1 Stat. at Large, 627, c. 22,) were also of force in California without other special legislation declaring them to be so. It cannot very well be contended that the words " entered in the United States," give an exemption from them on account of the word entered, because a ship has been brought into a port in the United States where an entry cannot be made, as it may be done in a collection district. The goods must be entered before a permit for delivery can be given. Shall one then be permitted to land goods in any part of the United States not in a collection district, because he has voluntarily gone there with his vessel where an entry of his

goods cannot be made; or to say, I know that my goods cannot be entered where I am, and therefore claim the right to land them for sale and consumption free of duty?

It has been sufficiently shown that the plaintiffs had no right to land their foreign goods in California at the times when their ships arrived with them, except by a compliance with the regulations which the civil government were authorized to enforce —first, under a war tariff, and afterward under the existing Tariff Act of the United States. By the last, foreign goods, as they are enumerated, are made dutiable—they are not so because they are brought into a collection district, but because they are imported into the United States. The Tariff Act of 1846 prescribes what that duty shall be. Can any reason be given for the exemption of foreign goods from duty because they have not been entered and collected at a port of delivery? The last become a part of the consumption of the country, as well as the others. They may be carried from the point of landing into collection districts within which duties have been paid upon the same kinds of goods; thus entering, by the retail sale of them, into competition with such goods, and with our own manufactures, and the products of our own farmers and planters. The right claimed to land foreign goods within the United States at any place out of a collection district, if allowed, would be a violation of that provision in the Constitution which enjoins that all duties, imposts, and excises, shall be uniform throughout the United States. Indeed, it must be very clear that no such right exists, and that there was nothing in the condition of California to exempt importers of foreign goods into it from the payment of the same duties which were chargeable in the other ports of the United States. As to the denial of the authority of the President to prevent the landing of foreign goods in the United States out of a collection district, it can only be necessary to say, if he did not do so, it would be a neglect of his constitutional obligation " to take care that the laws be faithfully executed."

We will here briefly notice those objections which preceded that which has been discussed. The first of them, rather an assertion than an argument—that there was neither treaty nor law permitting the collection of duties—has been answered, it having been shown that the ratifications of the treaty made California a part of the United States, and that as soon as it became so, the territory became subject to the acts which were in force to regulate foreign commerce with the United States, after those had ceased which had been instituted for its regulation as a belligerent right.

The second objection states a proposition larger than the case

admits, and more so than the principle is, which secures to the inhabitants of a ceded conquest the enjoyment of what had been their laws before, until they have been changed by the new sovereignty to which it has been transferred. In this case, foreign trade had been changed in virtue of a belligerent right before the territory was ceded as a conquest, and after that had been done by a treaty of peace, the inhabitants were not remitted to those regulations of trade under which it was carried on whilst they were under Mexican rule; because they had passed from that sovereignty to another, whose privilege it was to permit the existing regulations of trade to continue, and by which only they could be changed. We have said in a previous part of this opinion, that the sovereignty of a nation regulated trade with foreign nations, and that none could be carried on except as the sovereignty permits it to be done. In our situation, that sovereignty is the constitutional delegation to Congress of the power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

In respect to the suggestion that it has not been the practice of the United States to collect duties upon importations of foreign goods into a ceded territory until Congress had passed an act for that purpose, counsel cited the cases of Louisiana and Florida. The reply is, that the facts in respect to both have not been recollected. There was no forbearance in either instance, in respect to duties upon imports, until Congress had acted. Louisiana was ceded by a treaty bearing the date of the 30th of April, 1803, but the possession of it by the United States depended upon the terms of final ratifications by the parties to it, and upon the delivery of it by a commissioner to be appointed by the French government to receive the transfer from Spain to France, and by him to be immediately transferred to the United States. Articles 1, 2, 4, 5.

The surrender from Spain to France was formally made on 30th of November, 1803, and that to the United States was done on the 20th of December, 1803. It was known in Washington, by a letter from the commissioner appointed to receive it, early in January. It is said, that from that time until the act of the 24th of February, or, as was provided for in the act, until thirty days after, Louisiana was not considered, in a fiscal sense, as a part of the United States; and that duties were not only not collected by the United States on importations into Louisiana, but that duties were charged on goods brought from Louisiana into the United States. It seems to have been forgotten that our commercial intercourse with Louisiana had been the subject of legislation by Congress in several

particulars from the year 1800 ; and that before the revenue system could be applied, it was necessary to repeal that special legislation. Mr. Gallatin, in his report of the 25th of October, 1803, (American State Papers, Finance, vol. 2, 48,) suggested that it should be done. Congress, however, did not do so until the act of the 24th of February, 1804, was passed, by the third section of which the repeal was effected. The postponement of the operation of the act for thirty days longer, was with the view to prevent any conflict of rights or interests between what would be the new regulations of commerce under the act, and those which had preceded them.

It is only necessary to say as to Florida, that the treaty of the 22d February, 1819, was not ratified by the United States until the 19th February, 1821. In a few days afterward the act was passed extending our revenue system to it, subject to the stipulation in the 15th article of the treaty in favor of Spanish vessels and their cargoes. There was, then, no interval in either instance where duties were not collected upon foreign importations, because Congress had not legislated for it to be done.

The application of the revenue acts to North Carolina and Rhode Island, when those States had ratified the Constitution of the United States, though that was not done until the Constitution had been ratified by eleven of the States, does not support the position taken by the counsel of the plaintiff in error. Those States had been parties to the Confederation, and North Carolina was represented in the convention which formed the Constitution. It was to become the government of the Union when ratified by nine States. It had been ratified by eleven States, and Congress declared that it should go into operation on the 4th day of March, 1789. The subsequent ratifications by North Carolina and Rhode Island made them parties in the government. It brought them in, without new forms or legislation, and their senators and representatives were admitted into Congress upon the presentation of their ratifications. Special acts were passed to apply to them the previous legislation of Congress, and that of the revenue acts, as a matter of course, because, previously to the ratification, those States had not been attached to any collection district. But it was not supposed by any one that after those States had ratified the Constitution, that foreign goods could have been imported into them without being subject to duty, or that it was necessary to make them collection districts to make such importations dutiable.

But we do not hesitate to say, if the reasons given for our conclusions in this case were not sound, that other considera-

Cross et al. *v.* Harrison.

tions would bring us to the same results. The plaintiffs carried these goods voluntarily into California, knowing the state of things there. They knew that there was an existing civil government instituted by the authority of the President, as commander-in-chief of the army and naval forces of the United States, by the right of conquest; that it had not ceased when these first importations were made; that it was afterwards continued, and rightfully, as we have said, until California became a State; that they were not coerced to land their goods, however they may have been to pay duties upon them; that such duties were demanded by those who claimed the right to represent the United States — who did so, in fact, with most commendable integrity and intelligence; that the money collected has been faithfully accounted for, and the unspent residue of it received into the treasury of the United States; and that the Congress has by two acts adopted and ratified all the acts of the government established in California upon the conquest of that territory, relative to the collection of imposts and tonnage from the commencement of the late war with Mexico to the 12th November, 1849, expressly including in such adoption the moneys raised and expended during that period for the support of the actual government of California after the ratification of the treaty of peace with Mexico. This adoption sanctions what the defendant did. It does more — it affirms that he had legal authority for his acts. It coincides with the views which we have expressed in respect to the legal liability of the plaintiffs for the duties paid by them, and the authority of the defendant to receive them as collector of the port of San Francisco.

From these circumstances the law will not imply an assumpsit upon the part of the defendant to repay the money received by him from them for duties; the plaintiffs knew, when they paid him, that the defendant received them for the United States. The plaintiffs have no claim for damages against the defendant in justice or equity. They paid duties to which the United States had a rightful claim, and no more than the law required. The plaintiffs have paid no excess. The moneys were paid under no deceit, no mistake; the defendant has honestly paid them over to the United States, has been recognized as their agent when he acted as collector, and is not responsible to the plaintiffs *in foro conscientiæ*. The moneys were paid from a portion of the funds in the treasury of the United States, subject to the constitutional restriction that no money shall be drawn from the treasury but in consequence of appropriations made by law for such purposes as the Constitution permits. Our conclusion is, that the rulings made in this case in

the Circuit Court are correct. We shall direct the judgment to be affirmed.

## *Order.*

This cause came on to be heard on the transcript of the record, from the Circuit Court of the United States for the Southern District of New York, and was argued by counsel. On consideration whereof it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby affirmed, with costs.

### NOTE.

The following are the documents referred to in the above opinion:

1847, October 13. Mr. Marcy to Colonel Mason.

1848, July 26. Colonel Mason's Custom House Regulations.

1848, August 7. Colonel Mason's Proclamation, announcing the ratification of the Treaty of Peace.

1848, October 7. Mr. Buchanan to W. B. Voorhees.

1848, October 7. Mr. Walker's Circular.

1848, October 9. Mr. Marcy to Colonel Mason.

1849, March 15. Persifor F. Smith to Adjutant-General Jones.

1849, April 1. Persifor F. Smith's Circular to Consuls.

1849, April 3. Mr. Clayton to Thomas Butler King.

1849, April 3. Mr. Meredith to James Collier, Collector.

1849, April 5. Persifor F. Smith to Adjutant-General Jones.

1849, June 20. Persifor F. Smith to Mr. Crawford, Secretary of War.

1849, June 30. General Riley to Adjutant-General Jones.

1849, August 30. General Riley to Adjutant-General Jones.

1849, October 1. General Riley to Adjutant-General Jones.

1849, October 20. Carr, Acting Deputy-Collector, to Mr. Meredith.

1849, October 31. General Riley to Adjutant-General Jones.

1849, November 13. Mr. Collier, Collector, to Mr. Meredith.