Ereeman, J.,
delivered the opinion of the Court.
. .r¡ The question , on which’ this/ ca.se turns is, whe.th^p an act of the Legislature be valid, passed March 24fh> *105 1860, authorizing the Memphis Overton Hotel Company to issue certain bonds. The act in question is as follows:—
“That the Memphis Overton Hotel Company, by its proper officers, is hereby authorized and empowered to issue mortgage bonds, with coupons attached for interest, at a rate not exceeding ten per cent per an-num, payable at such times and places as the Board of Directors may direct, for an amount not exceeding •one hundred thousand dollars, and having ten years to* run from their date, for the purpose of raising means to complete the hotel now in course of erection by said company: — Provided, that such bonds, when issued, shall be a mortgage lien upon all the real estate, buildings, etc., belonging to said company.”
The bill in this ease was filed by creditors of' the hotel company, seeking to attach, and have appropriated to their debt, the interest on a fund in court-arising from the sale of the hotel property, which fund was to be appropriated to paying the bonds issued in pursuance of the above act, and the interest on said1 fund to keeping down the interest accruing on the bonds, till maturity. ■ The bill seeks to confine the bond-holders to six per cent on their bonds, and to1 have the surplus four per cent appropriated to the debt of the complainants.
It is claimed in 'the bill, that-“the act authorizing the issuance of said bonds ah ten- per cent interest is repugnant to, and in violation of; sec; 6, Art XI., of: the Constitution of the State of Tennessee, providing:— fThe Legislature shall fix the rate of interest, and the *106 rate so established shall be equal and uniform throughout the State;’ and that the Legislature having fixed the uniform rate of interest at six per cent, had no authority to allow ten per cent interest as to any person or corporation, upon his or its bonds or paper; and that therefore, as far as the bonds bear over six per cent interest, they are illegal and void.” •
There are other matters in the bill, but the demurrer on which the case was decided by the Chancellor, presented only two points; we need not, therefore, refer to any matter not embraced .in the demurrer.
The demurrer insists, “first, that the bill shows that the act of reserving the sum of ten per cent per annum, was authorized by the Legislature, and that said act is binding and valid, and not contrary to the Constitution; and, second, that as to the claims of complainants not reduced to judgment, they are not in a position to attack the transaction' for usury.”
The court overruled the demurrer as to the first point, and sustained it as to the second. Both parties appealed to this court.
Sec. 6, Art. XI., of the Constitution of the State of Tennessee provides: — “The Legislature shall fix the rate of interest, and the rate so established shall be equal and uniform throughout the State.”
The Legislature that met immediately after the adoption of the Constitution of 1834, in pursuance of this requirement of the Constitution, passed the act of 1835, ch. 50, sec. 3 of which provides, that “the legal rate of interest shall be, hereafter as heretofore, six per cent per annum, and at that rate for a longer *107 or shorter period,” and the same provision substantially is found in the Code, sec. 1944.
These are the provisions of the general law of the land, enacted by the Legislature, as fulfilling the requirement of the Constitution, that that body shall fix the rate of interest, and that the rate so established shall be equal and uniform throughout the State.
In the act before us, we have a different rate of interest provided for as to the one hundred thousand dollars in bonds to be issued by the Memphis Overtoil Hotel Company. Can this act be sustained, as equally in pursuance of the same article of the Constitution?' or, as authorized by any other provision of the Constitution? This is the question.
At the first glance at the provision of the Constitution, this would seem a very simple question; but the counsel for the bonds in this case has, with exceeding ingenuity and learning, presented an argument that, to say the least of it, shows that much may be said on both sides of the proposition.
The provision of the Constitution clearly meant that the Legislature should provide by a general law, operative alike upon all, and throughout the entire State, for a uniform and equal rate of interest. Is the act in question conformable to this requirement? It certainly is not, — under sec. 8 of the Bill of Rights, as that section has been uniformly construed by our courts,— the law of the land; that is, a general and public law, equally binding, in some aspects of it, upon every member of the community, which is the definition of “a law of the land,” as given by Judge Turley, in *108 the ease of Shepherd v. Johnson, 2 Ham., 296. It is operative only in favor of, or upon, the Memphis Overton Hotel Company, and it. authorizes that company to issue, its bonds at a-, rate of interest higher than, and different from, that prescribed by the general statute of the; State, by which the -rate of interest is fixed,, and made uniform and" equal, throughout the State.. No other person, whether natural or artificial, has the right, under this law, to issue- paper bearing this- rate of interest. It, then,, is-the grant.: of' a right (-whether it be a • privilege or not, need not be discussed. here) to. this; company, to-do-what i-f could not do- bindSmgly except -under the provisions of' this enao bling act of the Legislature. The very fact that the act of' the. Legislature had to be passed' for this purpose, settles it, we think, conclusively, that it is a law passed in derogation of the- general law of the land, to enable something -to be dono that could not legally be done without such, an act, so as to effectuate the end desired; — that is; the raising of means to- complete the hotel then i:n> course of erection»
It is insisted, however, that the uniform -rate of interest to be fixed by the Legislature, is simply- a restriction upon lenders^ intended' to prevent the grant of privileges to one lender or’ class- of lenders over- another, and at the same time= it' is- urged* that it does not restrict -'the- borrower, -and that he may- give- what; he pleases without ■ becoming; an- offender against the law.
It is urged that the true construction of this clause of’- the Constitution is, that the rate- established must operate equally and uniformly upon lenders, and that if *109 so; then - tbe ..law im -question, prbvidSng- only that -the eompiny ■ -may borrow-.at (ten -per .cent,-¡all .the citizens of «Tennessee- having". equally -ithe ¡right-¡-¡to' ’l-en-d -to this corporation, tbe law <is uniform -in the ¡true sense intended iby ‘tbe’ Constitution, -being in effect a law .to permit- all the- people- '®f■ Tennessee- to lend • at ten per cent to this! company,-^a law thus operative- upon tbe people of -¡the whole- State. - ...
>Is-.this. true,', however, in fact?
While ¡there’lis no -prohibition -upon ¡any ¡one to- .lend torthis company, yet practically, and -as-a -matter ©f-fact, only -a very small portion-of -the people- of tb.e State could- enjoy --this- ■ privilege; and -although -¡that number .is-.-not .defined,, o-r specifically designated,-by the law, yet it is confined -to -the .lenders; of ope bundled thousand- -dollars, And. to. .this corporation alone. It is a. -special privilege granted to ¡.these .-money lenders,- he they • -many ’or ■ few, w-itih. tfie¡ certainty -that it ’ ■ must ■wecessaafily be ■ limited .tP,--.an,d - enjoyed -hy,.? a-¡few of the- people of -the state. .If.-this be pot --.granting, a special privilege to. a,favored ©lass,, ¡prabüpally - exclusive of others' - no.t of that, .class,-.,-we -,©ninfeas- wo-í-are,¡ unable I©, see what- - wpuld, be-. The. privilege-¡-might have been more definite as. tp the individuals. -composing-.-the class;- but it eould not--have been imorefieertain- ib.-its -operationin Jbyor :-of.,-,a' class, and-,;fikat. .-limited rtc.--a comparatively small number of the citizens of the State Tyhp should lend to .this, corporation. ,v,
We irnay admit that -'usury l&w«s,- passed-: for> theupun-ishment ’ of' the.". offense ’ of taking more than six '.per cent -interest, inflict penalties only ¡on- -the- -lender-: htit *110 was it intended by the Constitution, not only to restrict lenders, but at the same time to confer affirmatively a privilege on the borrower? We cannot assent to this view, becaute it would involve the absurd conclusion that while a man might not lend money at over six per cent or the other uniform rate to be fixed by the Legislature, any man has granted him, by implication, a right to borrow at any rate he might choose, or might be able; and that the Convention intended to grant, by implication, the right for one man to give what no man should be authorized to receive. In a word, we cannot see how a man may be said to have the right to be a borrower under the law at more than six per cent interest, when there could by law be no lender at a higher rate.
The very idea of borrowing, as a necessary consequence, involves a person to lend. The one is the essential correlative of the other. No borrower can exist by authority of law without a lender, unless we may say that a man has the right to do by law what by law is absolutely forbidden to be done.
It is true, our law has inflicted no penalty on the borrower for paying more than the legal rate of interest; * but this exemption from penalty, cannot be held to operate as the affirmative grant of a right, or even as a recognition of a right in this case; as the *111 intent of the law, to prohibit the act, is as clearly manifested against it by inflicting the penalty on the lender, without whose violation of the law the other party can never borrow, as if it had inflicted penalties on both parties. By prohibiting lending at over six per cent, assuming that the law is obeyed, borrowing is as effectually and certainly prevented as if the prohibition had been against the borrower.
The Legislature certainly intended, by our usury laws, no grant of a privilege or right to the borrower, and the Constitution most certainly did not intend to require the Legislature merely to fix the rate of interest which lenders might take, but at the same time to leave the Legislature authority to allow, as a matter of right, by the same law, the borrower to pay a different rate. The Legislature under this clause of the Constitution could as well, if it had been deemed best, have inflicted the penalties of usury upon the borrower as on the lender, and no one could have doubted that the law was constitutional, and in strict conformity to the letter as well as the spirit of sec. 6, Art. XI., of that instrument, as intended to operate, and as operating, effectually to prevent parties taking more than the rate of interest allowed by law.
The true position is, that the Convention did not intend to discriminate in favor of the one class as borrowers and against the other1 class as lenders, by this provision; but only to fix a uniform rate for both. And that body never once conceived the idea that there could be a borrower authorized by law to borrow, without a lender authorized to lend on the *112 eapae .terms.' The -object of the Convention was to fix .the .rate of, interest at - osase uniform standard,. anti that .that rate should ,be,..w,hen paid by .the; borrower, the precise sum which', the-Ténder was -eii titled by Taw to receive.- ■ • ..
It is, true, that the ¡idea of- fixing >. rate of -interest beyond which the .citizen should, nsojfe-bé allowed te.-gn, was founded on, and-grew but of, -the-idea, that-.(She rapacity. .Q,f lenders should- -be restrainedbut this Idea W,as .never -intended do confer any privilege ..¡by law.oh the' borrower. ' The’ fallacious ■ element- that kirks'- -in the' ingenious argument ' on this question is, that ¡the matter to -be- regulated ' by the law - requited , by the .(Constitution, -is ' a contract on which, a . rate of .interest is -.agreed to be- .received, and that: all. .'eon-t-facts'.per ‘se involve, of'necessity, the .act of assent tc> ¡them -terms by two parties, — -when the contract is-íor a l'aau; of- money’, 4 . lender and ;a borrower-;-, • so that thé thing tq-.be regulated .by -.law, .c.outd -never exist- by any possibility in a borrower; alone,, unless he -could borrow'money fco.m nobody, .and ...contract, to-pay a. higher--.-rate -of interest .than’that- fixed- by- Jaw^ -to,, .-no onjey When this cap be done, -then .a borrower may. lawfully have the right to- borrow 'money at any .rate he pleases, and not violate the law; but not till them.
■As. to the argument, that this law had the essential element of uniformity in. it, required-by this clause-of the Constitution in -question, — since every person-, in Tennessee had -the -equal right to loan this money- -to the.- company, — we -need but. say., that the uniformity and equality required in the clause, is not one with *113 reference to the persons who may enjoy the privilege, but one with reference to the rate at which it shall be allowed; that is, that the rate of interest shall be uniform and equal. And while, for the sake of the argument, we might admit that any man theoretically had the equal right to loan this money at ten per cent, he must loan it to this company at this rate, or else violate the law; so that the right to borrow, granted to this company, is practically a right to loan at ten per cent, granted to this particular individual, the Memphis Overton Hotel Company, and to no one else. If the law had been one that authorized all persons to borrow money at ten per cent, as the-law of 1859-60 did, then it would have been a general law, in the sense of the Constitution, on that subject; but as it only allows this right to one .individual; it is a special right granted to this corporate body, enjoyed by no other under that law, and is not, in conformity to the requirement of the Constitution, a uniform and equal rate of interest throughout the State.
To illustrate the argument on this branch of the question, suppose the provisions of the Code, sections 1943-4, passed in pursuance of this clause of the Constitution, had embodied in them what is contended for in this case; they would then have read as follows:— “Interest is the compensation which may be demanded bv the lender from the borrower, or the creditor from the-debtor, for the use of money;” and then in the nexf section: — “ The amount of said compensation shall beat the rate of six dollars for the use of one hundred for one voar, and anv excess over that rate shall be *114 usury; provided, however, that the Memphis Overtou Hotel Company shall have the right to borrow one hundred thousand dollars on its bonds at the rate of ten per cent per annum.”
Would not any lawyer at once say, that this proviso was contrary to, and an exception from, the general enactment? and that the one was different, and diverse in principle, from the other? In a word, that one was a general law of the land, operating on every ■citizen, and the other an exception in favor of the hotel company, by which that company could do what the first part of the law had forbidden? This being so, it can make no difference that the law of 1859-60 was passed after the general law on the subject, and is not a part of it, or a proviso to it. The principle remains precisely the same, in either case.
This law cannot be sustained, then, under' the 6th clause of the Xlth Article of the Constitution, as conforming to the requirement of a uniform and equal rate of interest throughout the State. It remains to be seen whether it can be sustained under the other clause of the Constitution which is urged for its protection. That clause is the next one in the same Article, or the latter part of it, giving the Legislature power to grant such charters of incorporation as they may deem expedient for the public good. The whole section is as follows: — “The Legislature shall have no, power to suspend any general law for the benefit of any particular individual, nor to pass any law for the benefit of individuals inconsistent- with the general law of the land, nor to pass any law granting to any individual, *115 or individuals, rights, privileges, immunities, or exemptions, other than such as may be, by the same law, ■extended to any member of the community who may be able to bring himself within the provisions of such law:” — then follows the proviso, above referred to :— “the Legislature shall have power to grant such charters of incorporation as they may deem expedient for the public good.”
Conceding for the argument, at present, that the proviso was intended to make an exemption in favor ■of corporations, as against the limitations imposed on the Legislature by the first part of the section, does it follow that this law of 1859-60 can be sustained? It is a sound rule of construction, whether applied to a statute or a Constitution, that it shall be taken and •construed as a whole. “Such instruments,” says Mr. Cooley, “are adopted as a whole, and a clause which, standing by itself, might seem of doubtful import, may be made plain by comparison with other clauses.” He adds: — “ It is, therefore, a rule of construction that -the whole is to be examined, with a view to arrive at the true intention of each part. Effect is to be given, if possible, to the whole instrument, and to every section and clause. If different portions seem to conflict, the courts must harmonize them, if practicable, and lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory.” Cooley’s Const. Lim., ps. 57, 58.
“One part is not to be made to defeat another, if by any reasonable construction the two can be made to stand together.” Ibid.
*116 Construing the 7 th section, then, in connection with, the previous section, requiring a uniform rate of interest throughout the State, in accordance with the above principles, the result will be that the Legislature may grant such acts of incorporation as may be deemed expedient for the public good, but they cannot authorize such corporations either to give or take anything but the uniform and equal rate of interest fixed by the general law of the land in pursuance of the requirement of the 6th clause.
This view of the question allows full scope and operation to both clauses of the Constitution. The-Legislature, by virtue of the proviso in the 7th clause, may grant such acts of incorporation as may be deemed expedient for the public good, but cannot grant to such corporation powers or rights expressly forbidden, by any other clause of the Constitution.
To hold to the contrary of this, would be to hold' that the proviso to the section was intended not only-to exempt the Legislature from the limitations imposed upon it by the first part of the section, but also to enable them to override and fender nugatory the 6th section, in the case of every charter of incorporation, passed by that body.
We see nothing in the proviso to the 7th section, that, by fair construction, can make it operative to free the Legislature, in its grants of powers to corporations, from the law of uniformity and equality as to the rate of interest, to be fixed under the 6th section. This last mentioned section was intended to require the Legislature to pass such laws on the subject as should *117 regulate the action of the whole people of the State in the payment of interest.
It is a mandate to the Legislature to fix the rate of interest, that rate to be uniform and equal throughout her entire territory. We think that the true construction of this 7th section of' Art. XI. is, that the Legislature has the power to grant such acts' of incorporation as it may deem for the public good; that is, that the Legislature is to judge as to the propriety ■of granting the charter of incorporation, and whether the public good demand it; but that, as to the powers which they may grant to such bodies in the act of incorporation, they are to be restrained ■ by the other provisions of the Constitution, and can no more • grant a power to a corporation that shall contravene any other provision of the Constitution, than they can grant such power to an individual. In other words, the right to grant such charters of incorporation as they may deem expedient for the public good, does not ^authorize the Legislature to grant such powers and privileges as they may deem best, where these are in violation of any other clause of the Constitution. It is not an unlimited authority in the Legislature to grant powers to corporations, but only an unlimited authority to grant what charters shall be deemed proper to be granted. In other words, to decide when the public good shall demand that corporate powers .shall be granted, rather than leave the parties to act in their individual capacity and under their individual responsibility. Numerous cases are cited to sustain the *118 position of counsel for the defendants in this case, a few of which it is proper to notice.
The case of Caruthers v. Andrews, 2 Col., 379, is insisted on as sustaining this act.
We need but say that that case simply held that the conventional interest law of 1860 was not unconstitutional, but was in conformity with the provision of the Constitution, sec. 6, Art. XI. We need not examine the correctness of that opinion in its reasoning at present. Suffice it to say, that the marked-difference between that act and this was, that every lender in the State might not only lend his money at ten per cent, but he might lend to any individual, whether natural or artificial, in the State. There was. not a special privilege or restriction, that they might lend to only one individual or corporation.
The case of McCallie v. The Mayor and Aldermen of Chattanooga, 3 Head, 321, is also cited. That case involved only the question of exempting the lands of parties from taxation by the corporation, which by act had been extended so as to include this land, the exemption to remain while the land was held for “woodland or farming purposes.” This case is cited as a. law in which a special exemption was sustained. On looking at the case, it will be found, however, that the only question decided by the court was, that this exemption, contained in the charter, was not a contract,, but was simply a privilege which the Legislature might in its discretion bestow, and which it might at pleasure-take away, inasmuch as no private vested right was affected, in the sense of the Constitution.
*119 In the language of the court, “the grant of the privilege and its resumption were alike discretionary matters of sovereignty.” The case, so far as this question was concerned, rested on the sovereign power of the Government over the question of taxation. It is true, the rate of taxation on land or other property was required to be equal and uniform throughout the State; but it never has been held, that all property in the State must be taxed, in order to comply with the requirements of the Constitution.
The Legislature might tax whatever property they chose, and exempt such as they deemed best, but all that was taxed, must be at an equal and uniform rate. We can see nothing in this case that will sustain the act here in question.
The case rests on entirely different principles from the one under consideration. See State Bank of Ohio v. Knoop, 16 How., 198.
Another proposition in reference to this question which we deem it proper to notice, is, that the bonds of the company were negotiable securities, and, as such, marketable commodities, the issue and credit of which are favored in law, and subject to a peculiar policy which is indepenent of, and overrides, the policy of the usury laws.
Eor this, is cited the case of Adams v. Memphis & Little Rock R. R. Co., 2 Col., 660; but on looking at that case, we see nothing in it sustaining the latter part of the proposition, nor anything contravening the views expressed in this opinion. In fact, no such question as the proposition sought to be drawn from *120 it, is found in the opinion. The simple question presented was, “Had the Mayor and Aldermen of the City of Memphis the power, under their charter, to mortgage their real property or estate, for corporation purposes?”
This is the statement of the question, as given by Judge Milligan in the opinion delivered by him. It was held that they did have the power; and that, even if the power had been doubtful, and there were irregularities in the execution of the mortgage, the corporation was still liable, on the ground of long acquiescence, and other acts operating as an estoppel as against bona fide holders of the bonds which the mortgage was executed to secure.
This theory, that the Legislature may grant any powers to corporations they may deem proper, is in the very teeth of the intention of the framers of the Constitution, as shown by the history of this 6th clause, on the subject of a uniform rate of interest, and as conceded by the argument of the counsel for the defendants. He concedes in that argument that before the Convention of 1834 a charter had been granted to the Union Bank, and perhaps other banks, giving the privilege of taking 7 per cent interest, and cites the case of Hazen v. Union Bank, 1 Sneed, 115, a case on that question. He then says: “This exclusive privilege to corporations, proverbially not favorites with the people, very naturally would lead to restriction.” He adds, that a committee was appointed, who reported the 6th clause, with a statement of reasons, in which allusion was made to two things; — the need of *121 protection to the borrower; and these individious grants of exclusive privileges above referred to; — that is, bank charters. The counsel cites this for the purpose of showing that the object of the Convention was to restrict the lender and protect the borrower; but, the facts being so, can it be possible that the Convention, intending, by the sixth clause, to prevent the grant of a privilege to take more than the uniform rate of interest, to be established by law, and to prevent in the future what had already been done in the grant of a charter to the Union Bank, — that is, the right to take 7 per cent interest, — in the very next clause, the seventh, by the proviso thereto, gave power to the Legislature to allow corporations to take any rate of interest the Legislature might deem for the public good ? Surely, this cannot be the correct view of their action. If so, then, so far from obviating the evil against which they proposed to guard, they aggravated it, by giving it the sanction of explicit constitutional authority: and the Legislature was left to grant power to corporations to take any rate of interest they might choose; and thus was opened the flood-gate through which all the corruption that the aggregated capital and combined influence of these bodies could bring to bear, might be poured into our Legislatures.
There is certainly far more danger to be apprehended in this direction, to the public good and well-fare of the State, than ever will result from declaring unconstitutional the law in question, or even all the laws ever passed by the Legislature of a similar character, if any such were before us in this case.
*122 This theory, however, is essentially- erroneous in this; — that while it maintains that the Legislature may suspend a general law in favor of a corporation (which we do not assent to as a universal proposition), and therefore insists that the law on the subject of usury may be suspended, as one of these general laws, in favor of the Memphis Overton Hotel Company, as- in this case; yet it entirely fads to distinguish between the laws passed for the suppression of usury and the principle of our law fixing the rate of interest as based on a mandate of the Constitution itself; that is, the requirement that the rate shall be equal and uniform throughout the State.
There is a wide difference "between the suspension of the penalties of the usury laws, or any provision against usury, whether a penalty or otherwise, in favor of a corporation, and a suspension of a requirement of the Constitution. That requirement is, that the-Legislature shall fix the rate of interest. It is imperative. And the rate so established shall be equal and uniform throughout the State. This is equally imperative.
In this view, the only question is, Has the Convention, by the proviso to the seventh section, authorized the Legislature to suspend,, in favor of corporations, ' not only a general law passed by the Legislature itself, but also a distinct and substantive requirement of the Constitution ?
We cannot so conclude without laying down a rule the precise opposite of the one cited from Mr. Cooley, —“that one part of a constitution is not to be allowed *123 to defeat another, if, by any reasonable construction, the two can be made to stand together.”
But let us look at some of the consequences of holding that there is no limitation upon the powers the Legislature may grant to corporations, except its own conception of the demands of the public good, and that even a requirement of the Constitution may be disregarded in favor of corporations.
Let us look at the effect of this rule as applied to other clauses of the Constitution. Sec. 5 of Art. XI. provides that the Legislature shall have no power to authorize lotteries for any purpose, and shall pass laws to prohibit the sale of lottery tickets in the State.
Various laws have been passed inflicting penalties for selling lottery tickets in the State, in pursuance of this mandate of the Constitution. Upon the theory of the argument in favor of the act under consideration, the Legislature might suspend this general law against selling lottery tickets, in favor of a corporation, and might, by an enabling act, authorize any corporation in the State to go into the lottery business.
The argument is further made, that the hotel company needed no law to enable them to borrow money at ten per cent, as there was no law prohibiting it;— the statutes against usury only prohibiting parties from lending at a rate above six per cent.
. We need not further notice the fallacy that lies under the proposition that borrowers had a legal right to borrow at ten per cent, but lenders had not the right to lend at ten per cent; but we propose for a moment to test the argument drawn from the propo *124 sition that this statute only exempted the lenders from the penalties of usury.
If so, it is then a law passed for the special benefit of lenders of money to this corporation. Then it is in the very teeth of the prohibition of sec. 7 •of Art. XI., which is: — “The Legislature shall have no power to suspend any general law for the .benefit of any ” particular individual, nor to pass any law for the benefit of individuals, inconsistent with the general laws of the land; nor to pass any law granting to any individual or individuals, rights, privileges, immunities, or exemptions, other than may be by the same law extended to any member of a community who may be able to bring himself within the provisions of such law,”
Here, then, is a suspension of a general law foi the benefit of individuals, and a law' passed for the benefit of individuals, inconsistent with the general laws of the land. These individuals are, on the theory •of the argument, the capitalists who may lend their money to the Memphis Overton Hotel Company, and not all who may ever desire to do so, but only the few who shall lend the sum of one hundred thousand dollars on the particular bonds authorized by this single •act. If this is not prohibited by this clause of the •Constitution, then what law is? If this law can be sustained on this ground, why may not any individual liquor dealer in Tennessee be allowed to tipple without a license, by special law? Why may not the leading faro dealers of the S ate, to the exclusion of smaller dealers, be allowed, by special law, to deal *125 faro, in violation of the general law of the land, under the specious guise of relieving penalties imposed by the general statute? And' so on. Why may not any thing be authorized to any particular class, however violative of sound morals, or the general law of the land? We cannot assent to the correctness of reasoning that leads to these results.
It is argued, however, that the case of Burton v. The School Commissioners, Meigs, 587, is an authority sustaining this law. We think not, lor several reasons. What was that case? In 1826, the Legislature, to prevent the depreciation of Nashville Bank paper, passed an act by which it was provided that the notes of that bank, and its branches, should be received at par by the State in payment of debts due from purchasers of Hiwassee Academy lands, and also-in payment of one-half of any debt due the Bank of the State of Tennessee. The statute then made it the duty of the Directors of the Bank of the State of Tennessee to loan said money as fast as it might be received, for the shortest time, and upon the best terms possible, to be repaid in par funds. Burton borrowed this money from the Bank of the State of Tennessee, and with it paid a debt he owed the Bank of Nashville. The Bank of Nashville notes were depreciated at the time. He resisted payment of his note on this ground, claiming that the transaction was-usurious.
The court held him • liable, on the ground that the act of 1826 authorized and directed the Directors-of the Bank of the State to loan out the depreciated *126 Nashville Bank notes, to be repaid in par funds, and that the Legislature then had the constitutional power to pass this law, and to make that lawful which before was unlawful, as- being against the statutes as to usury. The court went on to add that it would be absurd to say that the Legislature had required the directors to perpetrate a crime for which they might be indicted.
In the argument of the case, it was insisted for the bank that the State, in allowing the State Bank to receive a higher rate of interest than was provided ■as the general rate throughout the State, was doing nothing more than had always been done for banks, and that this power had never been questioned.
The cases of the Union Bank and the Planters’ Bank were cited as instances. But the plain answer to this argument now is, that the clause of the Constitution of 1834, sec. 6, Art. XI., requiring the Legislature to fix the rate of interest, and providing that the rate so established shall be equal and throughout the State, was put into the Constitution to meet the very case of these' banks, and because of the grant of such power to them, as shown by the report of the •committee that reported this clause to the Convention.
It was enacted, that no more special privileges should be granted to these corporations to take a higher rate of interest than to other individuals; but that only one rate should be allowed to all throughout the State.
Now, should we hold the law here in question valid, do we not defeat the very purpose of the Con *127 vention, and practically repeal this clause of the constitution, by allowing the Legislature to do what a clause of the Constitution, enacted for the very purpose, says the Legislature shall not have the power to do?
The same thing may be said in reference to the ■question of authorizing lotteries. A provision is inserted to prevent the Legislature from authorizing ^ these, and to meet a similar class of cases.
But the principle in the decision in Meigs is, simply that the Legislature might release the penalty of the usury laws, and that they had done so by authorizing the bank to loan this depreciated currency, etc. Concede that the law was correctly viewed, as we do not doubt, at the time; can it be applied under our present Constitution to cases of rate of interest?
Let us put it in a logical form, and see how it will result. The proposition is, the Legislature had power, under the old Constitution, to release the penalties of the usury laws in favor of any individual, and to authorize such individual or any bank to take a different and higher rate of interest than was allowed by the general law then in existence; therefore, the Legislature may, by release of penalties of usury, authorize a rate of interest under our present Constitution that is not equal and uniform throughout the State, and may thus evade or repeal the sixth section of that Constitution, by extending the rule of the release of the penalties of a statute to the enabling of themselves to repeal the imperative mandate of the Constitution.
The argument drawn from the right to release pen *128 alties imposed for the violation of laws, we conceive, has no application whatever to this question. The penalty for taking usury is not imposed by the Constitution, nor required by it to be imposed. The Legislature could as well have passed a law fixing the rate of interest without any penalty attached for its violation. Thereby they wouid have obeyed this requirement of the Constitution. The one matter is a question of criminal law, — an enforcement of the penalty imposed; the other is a question of constitutional power to grant a privilege, — questions as diverse in. their nature as can be conceived.
But again, the argument shifts its ground and proceeds upon the proposition, that the proviso to the seventh section, authorizing the Legislature to grant such charters of incorporation as they may deem expedient for the public good, authorized them to grant the Memphis Overton Hotel Company the right to. issue and sell bonds with interest at 10 per cent.
At present, we need not further construe this proviso, but only meet the argument drawn from it, by confronting it with the position which is the control-ing one in the first part of the argument already considered.
It is there maintained that the act only releases penalties against, lenders, — the capitalists who may lend to this company; and here it is sought to save this law by insisting that it comes under the authority to grant acts of incorporation.
The simple reply to all this is, that these lenders are not corporations, nor are they authorized to lend, *129 by virtue of acts of incorporation; therefore, they can not claim shelter under this clause, even if it admitted of the construction sought to be put upon it. It can not be that an act releasing capitalists from the penalties of usury in the particular case of loaning to this company on these bonds, is an act of incorporation. Unless it is an act of incorporation to them, it can never be protected by this proviso. It is, however, maintained that the Legislature was prohibited, by the first part of sec. 7, Art. XI., from granting acts of incorporation, as being a law for the benefit of individuals, and that the proviso made an exception to this clause, and authorized the suspension of general laws by acts of incorporation, and that the interest laws may as. well be involved in a grant of an act of incorporation as any other. Admitting this, for the sake of the argument, still, does the authority to suspend a general law involve the right to suspend a mandate of the Constitution? And so we are brought back to this question at last, whether the rate of interest is to be uniform and equal as required by the Constitution, which is not merely a general law, but is the supreme law of the land, each section being equally imperative and binding upon the Legislature, and upon this court.
In answer to the whole argument, in this aspect of it, as presented by the illustration of a railroad company, authorized under the clause of. the Constitution for the encouragement of internal improvements, when the company finds it cannot complete its work for want of means, and applies to the Legislature to *130 enable it to borrow money at a higher rate than six per cent, we need but say that the Legislature has no more power, under the idea of encouraging internal improvements, to violate another clause of the Constitution, than it has to violate that instrument in favor of a charity, or to encourage a distillery. In a word, we hold the Constitution to be supreme in all its mandates, — the will of the people in the form of limitations upon the power of its agent, the Legislature; and, as such, to be above any requirements of supposed necessity, or any fancied demands of the public good. It is of itself the test of all power, as well as the standard of what is best for the people of the State. Obedience is due to it as being that which will most surely and certainly subserve the general good. Disobedience to it, or evasion of it, however plausible the pretext, is the greatest of all public evils, • introducing a spirit into our legislative and judicial decisions that is subsersive of all stability, and destructive to the central idea of our government, both State and Federal, — that of fixed, unchanging, eternal barriers, prescribed by written constitutions, to the exercise of power by the agents of the people, whether •executive or legislative.
Holding these views, we shall not hesitate to strike down all laws passed in violation of the Constitution .■as we understand it; standing, as we do in the midst ■of circumstances that seem to have generated the notion that if the end be deemed good, the means to attain that end are always to be found. in the Constitution, a theory which will sanction all the abuses, *131 and even oppressions, which a dominant majority may see fit to impose upon a powerless minority.
We deem it the first duty of this court, not only to preserve the Constitution intact, but to hold it high above all supposed necessities of corporations or citizens, or the demands and exactions of power. Nor ■can we consent to evade its plain provisions, either by bending our construction of it to supposed cases of hai’dship, or suffering it to be influenced by subtleties and nice distinctions, having no real support in the plain purpose and intent of that instrument. In a word, however individual members of this court may differ as to what is the constitutional limitation in a particular case, yet, individually and as a court, we will, when a constitutional guaranty is invoked, or a limitation presented, at all ■ times, promptly and fearlessly, respond that the Constitution is the supreme law of the land, before which all must bow, individuals, courts, and legislatures, and over whose barriers none must pass.
We need not extend this discussion,, already continued to greater length on this point than was desirable. We conclude by saying that, however great 'the interests which may hang on this decision in other directions, as suggested in the argument, we cannot look to such consequences as a guide to our conclu-sions in this case, but must decide the question before “us upon our conviction of what the law is. We must leave consequences out of consideration where we think the path of duty plain. In this, as in all *132 other oases, we can hut declare the law. At that point our duty ends.
The other question presented by the demurrer, whether these creditors, or some of' them, who had not reduced their claims to judgment, were in a position to maintain this bill, has not been pressed in argument seriously by the defendant’s counsel, but it is proper that we settle it. The Chancellor sustained the demurrer upon this ground.
This is not strictly a bill to recover money paid as usury, but it is that in substance. The money sought to be realized has passed from under the control of the debtor, and is in the hands of the trustee-of the creditor.
As, under our statute, the right of the creditor to recover the money can be enforced only after he has obtained a judgment, we think that the Chancellor decreed correctly in sustaining the demurrer upon this, ground.
The bill presents, under the Code, no case for the administration of an insolvent corporation, and cannot he looked to in this aspect.
The result is, that the Chancellor’s decree must be affirmed with costs.